**COALITION OF CONCERNED CITIZENS AGAINST I–670, et al., Plaintiff,**

**v.**

**Aurel DAMIAN, et al., Defendants.**

**No. C–2–83–0817.**

United States District Court, S.D. Ohio, E.D.

Dec. 12, 1984.

Louis A. Jacobs, Marya C. Kolman, The Ohio State University College of Law, Columbus, Ohio, for plaintiff.

James Rattan and John Kraybill, for defendant Elizabeth Dole, Secretary of Transp.

Gregory Lashutka and Curtis Gans, Columbus City Attys., for defendant Aurel Damian.

Michael Igoe and Amy R. Goldstein, Ohio Asst. Attys. Gen., Columbus, Ohio, for defendant Warren Smith, Director of Ohio Dept. of Transp.

Robert Holland, Columbus, Ohio, for defendant Mid-Ohio Regional Planning Com'n.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter came on for trial before the Court on October 29, 1984. In addition to testimony presented at trial, the parties have submitted extensive agreed stipulations of fact and joint exhibits for consideration by the Court. The joint exhibits comprise the administrative record of planning and development. Plaintiffs, the Coalition of Concerned Citizens Against I–670 and a number of its individual Black members living in areas that would be affected by the construction, have brought this action seeking declaratory and injunctive relief with respect to construction of an extension of Interstate 670 ("I–670") from downtown Columbus to the Columbus Airport. The defendants are officials from the City of Columbus, State of Ohio and the federal government responsible for highway projects as well as the Mid-Ohio Regional Planning Commission, which is a federally designated planning organization.

Plaintiffs contend that defendants violated federal law in two respects in the planning and development of the I–670 Project.[1] First, they assert that defendants failed to involve the public in making the decision whether a freeway was needed to meet anticipated traffic demand. Plaintiffs argue that this narrowed scope of public input violates federal regulations promulgated under the Federal-Aid Highway Act, 23 U.S.C. §§ 101 et seq. Second, plaintiffs contend that defendants failed to take into account the disproportionate impact of I–670 upon minority citizens of Columbus in

---

1. Plaintiffs at trial voluntarily dismissed with prejudice the first, third and sixth causes of action in the complaint. Tr. 5–6. Further, plaintiffs did not pursue their claims arising under the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., in their post-trial brief. The Court considers these claims to have been abandoned as well.

violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* Plaintiffs seek declaratory relief and an injunction prohibiting the beginning of construction on I–670 until these alleged violations of federal law are corrected by holding further public hearings on the need for and impact of I–670 as it has been proposed. Defendants deny plaintiffs' allegations on the merits and, in addition, raise the affirmative defenses of lack of standing and laches.

Upon consideration of the record made in this case and the arguments of the parties, and for the reasons stated in the Opinion which follows, the Court concludes that one of plaintiffs' contentions is well-taken, and, therefore, declares that defendants failed to comply with federal regulations requiring public involvement during the early phases of the planning of I–670. With regard to all other contentions raised by plaintiffs, the Court concludes that judgment must be entered in favor of defendants. Upon the whole record made in this case, it is apparent to the Court that the injunction the plaintiffs seek cannot be issued.

In Part I of this Opinion, the Court will state the facts of this case. Because the facts are largely not disputed by the parties, the Court sees no need for formal findings of fact, but will instead state the facts narratively. The Court has no intention of writing the definitive history of the I–670 Project, but only of discussing certain material matters pertaining to the planning process. In Part II of this Opinion, the issue of standing that has been raised by defendants will be considered. The merits of plaintiffs' claims are addressed in Part III and, finally, the matter of relief is considered in Part IV.

## I.

At the date of this Opinion, all planning and preliminary development for I–670 has been completed. Nearly all properties that must be taken for the purpose of freeway right of way have been acquired by the defendants, at an approximate cost of six million dollars. Residential and commercial buildings in the right of way have been demolished in preparation for construction. With the exception of work on an interchange that is not integral to the I–670 Project, no construction contracts have been let, nor has any construction work begun. Further, approval of plans, specifications and estimates by the federal government, which is a prerequisite to the letting of contracts has not yet been given. The next bids are scheduled to be let in January, 1985, pending the resolution of the issues raised by plaintiffs in the instant case.

As finally planned, the proposed extension to I–670 would run approximately 5.7 miles to connect the Columbus Innerbelt, which circles downtown Columbus, and Interstate 71, which runs north and south through Columbus, with the Columbus Outbelt, Interstate 270. Special connectors to major streets serving downtown Columbus and the Ohio Center, a convention center complex on the north edge of downtown, and Port Columbus Airport would be provided. The proposed I–670 extension will be six lanes, with one lane in each direction reserved for transit and other high occupancy vehicles. In addition, a bikeway will be located generally within the project right of way.

As finally proposed, I–670 would originate in the northeast corner of downtown Columbus, linked to existing I–670 and I–71 in the general area of an existing interchange known as the Fort Hayes Interchange. A significant part of the proposed roadway would be located in what is presently railroad property. However, the greatest displacement of persons and residences occurs in this area. Sixty households and approximately 191 persons will be displaced. See Agreed Stipulations ¶ 121. This area of Columbus is 50 to 90 percent black, and is characterized by high population densities. *See* Jt. Ex. 25: Final Joint Environmental Impact Statement, Figure III–9. Approximately half of the households displaced in this area are renters, and about a third of the households

displaced are below the poverty line. Further, about three-quarters of the persons displaced in this area are black. *See* Agreed Stipulations ¶ 121. None of the individual plaintiffs reside in this area of Columbus.

From the Fort Hayes area, the proposed extension of I–670 runs to the east, following what is now Penn Central right of way which has been abandoned by the railroad. Although the area of Columbus to the immediate east of downtown is over ninety percent black, there is minimal displacement of persons and residences due to the availability of railroad right of way. Agreed Stipulations ¶ 121; Tr. 182. Several miles out of the downtown area, proposed I–670 turns to the north to follow Alum Creek. It then bears to the northeast following the present route of U.S. 62. I–670 will displace approximately 128 persons and 39 households in this area. Nearly 85% of persons displaced are members of racial minorities. Agreed Stipulations ¶ 121. Finally, I–670 would join I–270, the Columbus Outerbelt, at what is presently an interchange with U.S. 62. There is a major interchange proposed to provide access to the Columbus Airport in this area. The connection to the Airport will displace approximately 36 persons, about 20% of whom are minorities. Agreed Stipulation ¶ 121.

Plaintiffs' claims of illegality under federal law relate solely to the planning and location phases of the I–670 Project. These phases will be described in some detail in this part of this Opinion. First, however, it is of some importance to describe the institutional and regulatory context of the planning process in the case of the I–670 Project.

In September, 1972, regulations pertaining to the consideration of economic, social and environmental impacts of highway projects, which were codified in part 795 of Title 23 of the Code of Federal Regulations, were issued by the United States Department of Transportation. Each state was required to develop and implement an "Action Plan" for federally funded transportation improvements. To comply with federal requirements, the Ohio Department of Transportation (ODOT) promulgated a document called Action Plan, which was approved by the Federal Highway Administration (FHWA) on February 19, 1974. The procedures of the Action Plan were subsequently revised and are contained in the Ohio Transportation Development Process, which was approved by the FHWA on July 29, 1977. These two documents set forth the process for consideration of social, economic and environmental factors in the development of transportation projects. These procedures applied to all transportation systems planning and highway projects under the jurisdiction of Ohio Department of Transportation during the various stages of development of the I–670 Project. Agreed Stipulations ¶ 9–11; Jt. Ex. 34, 39.

Under the procedures set forth in these documents, transportation development projects are divided into phases, where each successive phase involves planning at a more detailed level. In general, transportation projects proceed through four phases. The first stage—referred to in this Opinion as the systems planning phase—is one of initial planning, in which traffic projections and existing transportation capabilities are studied to determine whether transportation improvements are needed and, if so, what types of improvements are needed. In the I–670 Project, this phase began in June, 1974 and continued through March, 1976. The second stage—referred to in this Opinion as the location phase—is the initial design stage where alternative routes for improvements recommended during the systems analysis phase are considered, and one route chosen. This phase lasted from 1976 to 1981 in the I–670 Project. The third stage—referred to in this Opinion as the design phase—involves final design and specific planning for the route chosen in the location phase. At present, the I–670 Project is in this phase. The fourth and final phase—the construc-

tion phase—involves the actual building of the improvement.[2]

A central role in the planning process was played by defendant Mid-Ohio Regional Planning Commission (MORPC). MORPC was created by agreement among approximately 25 constituent government units, consisting of Franklin County, all cities, villages and townships within Franklin County, and some adjacent townships. Its members are appointed by the member governments; these appointed members may be public officials or ordinary citizens. MORPC has been, since the beginning of the I-670 Project, the federally designated Metropolitan Planning Organization for the Central Ohio area. *See* 23 U.S.C. § 134. MORPC had the primary responsibility for the systems planning phase of the I-670 project.

MORPC committees include: Executive, Policy, Transportation Advisory, Citizens' Advisory, Finance, Personnel, Nominating, the Franklin County Planning Area Subcommittee, and Community Development. Ultimate authority within MORPC resides in the Executive Committee. It consists of 10 members of the Commission elected by the membership. Fifty-one percent of the Executive Committee must consist of elected or appointed officials; one member must be appointed to represent minorities, disadvantaged and low income groups. The Policy Committee is an expansion of the Executive Committee, which includes in addition representatives from the Central Ohio Transit Authority, and state and federal highway departments. This Committee was created to conform to requirements of federal law in order to make decisions on transportation. Tr. 136; *see* C.F.R. § 795.-10(b)(3) (1974).

Proposals that must ultimately be approved by the Policy and Executive Committees originate in the staff of MORPC. Staff proposals and reports are periodically presented to two additional committees before they are referred to the Policy and Executive Committees. One is the Citi-

zens' Transportation Advisory Committee (TAC), which consists of people who are technically involved in urban transportation. Its members are city engineers, representatives of governmental authorities, and representatives of private businesses and utilities. The other is the Citizens' Advisory Committee (CAC) which consists of individuals from governments, neighborhood organizations, civic groups, organized professional interest groups, and low income and minority groups.

As will be explained below, the nature of the CAC is of some importance to this case. At the times that the primary decisions concerning the development of I-670 were being considered, i.e., from 1974 to 1977, the CAC consisted of approximately 100 members. The membership is divided into several categories. First, a number of townships and cities within Franklin County are members. Second, a substantial number of governmental organizations and instrumentalities as well as professional associations are members. Third, a number of civic organizations appear on the membership roster. And finally, there are a number of individual members, a substantial number of whom appear to be associated with banks, mortgage companies, utilities and media. Jt. Ex. 85, 86. Membership in the CAC is open to all interested persons. There is, however, no formal process by which applicants are solicited. To become members, individuals or organizations must hear of the existence of the organization and its activities through the media, and take the initiative to join. Media regularly attend meetings, and individuals have requested to become members after hearing about CAC activities. Plaintiffs White and Banks testified at trial that they were unaware of any opportunity to express their views concerning I-670 prior to 1976. Tr. 38, 90.

Both the TAC and the CAC receive monthly reports from the staff of MORPC. In addition, the CAC receives reports re-

---

**2.** The two Ohio planning documents use different names for the various phases. To avoid confusion, the Court will use the terminology

suggested in federal regulations. *See* 23 C.F.R. § 795.2(e) (1974).

garding on-going projects. In the case of planning regarding I–670, MORPC staff appeared four times to report upon the state of the project, culminating with the presentation of a final report. The purpose of these presentations was to solicit comments from the members of the committee. The committee voted upon the proposals put to it. However, it was not in reality a decision maker; rather, its votes amounted to recommendations to the Policy Committee.

There is conflicting evidence in the record concerning whether plaintiffs participated in the CAC during the systems planning phase of the I–670 Project. At trial, individual plaintiffs Banks and White testified that they had not been involved in the CAC during the time of systems planning, that is, prior to 1976. This testimony was impeached with apparently conflicting testimony from the depositions of these plaintiffs. Tr. 53–56; 112–115. The Court has examined the depositions of the plaintiffs, and finds that each is vague about precise dates. Jt. Ex. 119 at 150; Jt. Ex. 120 at 58–59. Further, there is no indication of plaintiffs' membership in the membership lists of the CAC, Jt. Ex. 85, nor of attendance in the minutes of meetings submitted to the Court. Jt. Ex. 83, 85. Further, the director of transportation of MORPC, Mr. Mohamed Ismail, testified that plaintiffs were not members of the Committee. Tr. 31. Thus, the Court concludes that plaintiffs Bank and White did not participate in the CAC prior to 1976.

The Court now turns to consider the planning process in the I–670 Project. There is no dispute about the need for some sort of transportation improvements in the general area that I–670 will serve. Since the early 1950s, government officials have recognized that population pressures and expanding development indicated a need for improved transportation in the northeast quadrant of the City of Columbus and Franklin County. In 1957, the Columbus City Planning Commission proposed in its Annual Report that a six-lane freeway be built between the Fort Hayes Interchange and the Airport. This report also proposed that an expressway be built between I–71 and the Airport along 17th Avenue. In 1961, the Franklin County Commissioners authorized the preparation of an engineering study of the feasibility of a freeway or arterial connection between the Airport and I–71. Substantial progress was made toward construction of this project. By 1967, a portion of the proposed 17th Avenue Freeway was ready for construction. Jt. Ex. 25: Final Joint Environmental Impact Statement, I–1 to I–3; Jt. Ex. 27: Leonard-Maryland-Sunbury/I–670/17th Avenue Systems Alternatives Study, Appendix 1.

By 1972, MORPC completed the Franklin County Regional Transportation Plan, which was adopted by the member governments in the following year. This Plan featured 17th Avenue as an expressway, and Leonard, Maryland and Sunbury Avenues as an artery to the northeast corridor. At the time, it was believed that these improvements would suffice to meet the transportation needs of the area to the year 1990. In August, 1973, representatives of FHWA, ODOT, the City of Columbus and MORPC met to discuss how "Action Plan" requirements would affect the 17th Avenue expressway. They concluded that a Corridor Location Alternatives Report should be prepared. Thus, the 17th Avenue expressway was entering the location stage.

However, several developments led to the abandonment of the 17th Avenue Expressway. First, due to increasing environmental concerns, local officials began to re-examine the impacts associated with constructing an expressway through residential neighborhoods. In addition, their examination of other possibilities revealed that the railroads had abandoned a number of tracks in their right of way between the Fort Hayes Interchange and Alum Creek. It appeared that a freeway could be located within existing railroad right of way and only minor additional right of way would need to be acquired. Finally, during the early 1960s, the City of Columbus was planning an improvement in the area of

Leonard Avenue to meet the improved section of U.S. 62.

In November, 1973, as a result of concern stemming from the 17th Avenue Project, MORPC held a meeting with various agencies and communities. A follow-up meeting was held in February, 1974. At these meetings, a number of governmental entities and local organizations discussed the status of the project and its impact upon other streets. In particular, there was concern about the impact of the project upon Lane Avenue and 17th Avenue. There was general agreement that more data was required to determine the full impact of the proposed Lane/17th Avenue Connector.

An extension of I-670 as an alternative to the 17th Avenue Project was first proposed publicly by the City of Columbus Service Director, Richard Jackson on March 12, 1974. The following day, the Technical Advisory Committee of MORPC was briefed on the I-670 proposal as an alternative to the 17th Avenue Project. At about the same time, MORPC was considering proposals for siting of the 17th Avenue Project. As a result of the city's initiative regarding I-670, further study of the transportation needs of the northeast quadrant was initiated.

In June of 1974, representatives from the City of Columbus, MORPC, ODOT and FHWA met to determine the procedures and methodologies for a systems analysis to compare I-670 and 17th Avenue as solutions for the northeast corridor. The result was the Leonard-Maryland-Sunbury-I-670-17th Avenue systems analysis conducted by MORPC. Jt. Ex. 27. In this study, five basic alternatives were considered, involving different combinations of arteries and freeways along 17th Avenue, I-670 and Leonard Avenue. One of the alternatives was so-called no-build alternative, which involved leaving the entire corridor as it was; consideration of a no-build alternative is required by federal law. *See* 23 C.F.R. § 795.3(b)(2) (1974). Three of these alternatives were studied in detail. One involved 17th Avenue as an artery, I-670 as a freeway and no improvement to Leonard Avenue; another was 17th Avenue as a freeway, Leonard Avenue as an artery and no I-670; the third alternative was the no-build alternative. Tr. 145. The conclusion of the study was that I-670 should be built.

The alternatives study considered a number of factors in arriving at the recommendation that I-670 be built. The effect upon traffic flow of the various alternatives was considered at great length. In addition, compatibility with increased use of mass transit, accessibility of health facilities, impact upon air quality, and general costs and benefits were considered for each of the three alternatives studied in detail. Except for consideration of the number of businesses and residences displaced, there is minimal discussion of the social impacts of the alternatives studied. There is no discussion of the impact upon racial and other minorities of the various alternatives. Jt. Ex. 27, *passim.*

According to MORPC's report, the alternative which involved construction of I-670 was preferrable to the other two alternatives in most of the respects studied. According to the testimony of Mohamed Ismail, several factors in particular were primary reasons for preferring I-670 to the 17th Avenue freeway. First, construction of I-670 would minimize the taking of homes as compared to 17th Avenue freeway. The latter would involve taking in excess of 500 homes, while the former, as finally planned, would displace 109 homes. Second, construction of I-670 would allow use to be made of abandoned railroad tracks, and would minimize acquisition of right of way. And finally, I-670 would create opportunities for industrial and commercial development in the area. Tr. 147.

Beginning in June, 1976, the I-670 Project entered the location stage. Primary responsibility for this phase of development resided in the I-670 Coordinating Committee, which consisted of representatives from FHWA, ODOT, the City of Columbus and project consultants. The purpose of this stage was to select a location

for the I–670 freeway, if a feasible location could be found in light of the social, economic and environmental impacts of various possible freeway locations. In order to evaluate impacts of various locations, the experts use a hypothetical "no-build" alternative as a point of comparison for the purpose of defining potential beneficial and adverse impacts. This process of comparison with a hypothetical "no-build" alternative was required by the procedures set forth in the Action Plan and the Transportation Development Process to comply with federal law. 23 C.F.R. § 795.3(b)(3) (1974). The "no-build" alternative used for this purpose included: 1) no improvements to streets in the Leonard Avenue corridor; 2) 17th Avenue improved as a major arterial street between I–71 and U.S. 62, (3) a limited access connector between Port Columbus Airport and U.S. 62; and (4) a limited access connector between the Ohio Center and I–71. In other words, the "no-build" alternative involved construction of the planned transportation projects in the region except for particular project under consideration.

During the location phase of the I–670 Project, the Draft Environmental Impact Statement and the Final Joint Environmental Impact Statement were prepared. The former was completed in July, 1980; the later was completed after a public hearing of October 1, 1980, and the solicitation of comments. As part of the process of preparation of the Environmental Impact Studies, sixteen different preliminary I–670 location alternatives—including the "no-build" alternative discussed above—were considered. In the argot of the highway engineer, these are known as "reasonable alternatives." These are possible freeway locations that appear, after preliminary study, to have some merit.

These reasonable alternatives were assessed according to four major categories of impacts: (1) socioeconomic and land use, (2) environmental, (3) transportation, and (4) cost. *See* Jt. Ex. 50: I–670 Extension: Assessment of Reasonable Alternatives. Within each of these categories, a number of variables were assessed, so that, in all,

37 variables were considered. Under the first category of socioeconomic and land use impact, the effect of different freeway locations upon community cohesion, accessibility and availability of services, and impact upon disadvantaged groups were considered. Of the alternatives studied, only the "no-build" alternative would have no impact upon the disadvantaged. The other 15 alternatives would have either high negative impact or moderate negative impact upon the disadvantaged. *See id.* at 16.

It is abundantly clear from the record made in this case that public involvement during the location stage was substantial. The main vehicle for public involvement was the Citizens Advisory Group (CAG), which was established by the City of Columbus in May, 1976 for the purpose of receiving public comments and providing information to the public. The CAG was composed of representatives of the civic associations in the project study area. It met at least sixteen times to discuss the project. There is no dispute that diverse groups of representatives, including both blacks and whites, participated in the CAG. There is also no dispute that persons opposed to the construction of I–670 were active in the CAG and expressed their views. In particular, plaintiffs Banks and White were members of the CAG as representatives of the Shepard Community Association. In that capacity, they were able to present their views on I–670 and alternatives to it.

In addition, defendants conducted a number of public informational meetings during this phase of the I–670 Project. Also, they published the I–670 Newsletter for the purpose of informing interested members of the public on the status of the project. Eventually, the mailing list of persons receiving the newsletter grew to about 2,000 people. Further, the I–670 program involved radio and talk show participation by public officials involved in the I–670 planning and development. Several of the plaintiffs in this action participated in these talk shows. There was uncontradicted testimony at trial from Lawrence Kastner,

District Engineer with the FHWA in Columbus, that public involvement in this phase of the project far exceeded what is required by federal law. Tr. 191; *see also* Jt. Ex. 26: I–670 History of Public Involvement.

It also appears that this public input was considered in the process of selecting a particular route for I–670. In the process of project development, the sixteen reasonable alternatives were reduced to a smaller number of "feasible alternatives." These represent possible locations that, upon further consideration, warrant extensive study to determine impacts on a more detailed level. In the case of I–670, there were five such feasible alternatives, including the "no-build" alternative. In eliminating the eleven other alternatives, the I–670 Coordinating Committee relied upon two bodies of information: data regarding probable impact, and public input from public meetings, reports from neighborhood meetings and information generated by the CAG. *See* Jt. Ex. 52: Assessment of Reasonable Alternatives Leading to a Set of Feasible Alternatives, at 17.

Due to significant public opposition to the I–670 proposal, and in response to lobbying by plaintiff Coalition, in 1977 the Columbus City Council authorized funds for the study of mass transit alternatives to the construction of I–670. This study was made by MORPC under a special contract with the city. The resulting study, entitled "Northeast Corridor Transit Alternative Study To I–670," was completed on June 30, 1978. Jt. Ex. 30. Plaintiff Coalition worked closely with MORPC in conducting this study and had some input in it. A draft of the study was submitted to the Coalition and the CAG for their comments. In addition, two general public involvement meetings were held in the spring of 1978 to hear public comment upon the proposed report.

The study recommended an alternative to I–670 that consisted of a new arterial roadway connecting downtown Columbus with existing U.S. 62, a new busway transit facility connecting downtown Columbus with

a park-n-ride lot near Port Columbus, and a number of companion street improvements. The executive summary to the report states: "Taken together, these elements can serve travel demand in the northeast corridor, and are a feasible alternative to the I–670 freeway." *See* Jt. Ex. 30: Northeast Corridor Transit Alternative Study to I–670, at ii.

There is no dispute that one of the alternatives considered in the City Council funded restudy was that put forth by the Coalition. Tr. 110. The Coalition's alternative involved a combination of improvements to streets and underpasses in the northeast quadrant and development of light rail transit. Tr. 110. The restudy ruled out light rail as an alternative to a freeway on the ground that the northeast quadrant would not provide sufficient ridership. Agreed Stipulation ¶ 92. The Court concludes from the record that the Coalition's alternative solution to the acknowledged transportation problem in the northeast quadrant of the city was considered in good faith and rejected as inadequate.

As noted above, extensive public involvement was incorporated into the process of restudy of transportation needs in the northeast corridor. Although public reaction was mixed, a majority of citizens attending the second citizen involvement meeting disliked the recommendation, particularly the Alum Creek arterial. The plaintiffs also rejected the recommendations of the restudy. The report commented:

> The technical analysis, however, proved conclusively that additional roadway capacity, beyond that achievable through improvements to the existing street system, was needed to reduce congestion and adequately serve travel demand within the corridor.

Jt. Ex. 30, at 24.

The results of the City Council funded restudy were unique and were not directly comparable to the results of the other I–670 studies. This noncomparability was due to the use of different assumptions regarding population growth, development

patterns, and travel demand. Apparently, the data used in the original study that recommended the construction of I–670 had overestimated population growth and development. Tr. 149–151; 156–7. No formal restudy was done to make the results of the restudy comparable to those of the original studies recommending the construction of I–670.

The relative merits of the non-freeway alternative selected by the restudy and I–670 as proposed were discussed in the Final Joint Environmental Impact Statement, Jt. Ex. 25, that was prepared in connection with the I–670 Project. The authors of that statement concluded:

> The comparison of the selected alternative from the MORPC study (non-freeway) with the proposed I–670 Extension reinforces the need for a freeway in the northeast corridor and confirms the results of the previous studies which led to the present location/environmental analysis study. Even if both a new four-lane arterial and a new two-lane busway are provided in the place of a freeway, projected future traffic volumes on the major surface streets in the corridor will, for about 80% of those streets, exceed the available capacity.

Jt. Ex. 25, at I–24. It appears to the satisfaction of the Court that this conclusion is adequately grounded in a fair consideration of the results of the mass transit alternative restudy. *Compare* Jt. Ex. 25 at I–24, with Jt. Ex. 30: Northeast Corridor Transit Alternative Study to I–670, at App. 2, table 4. Although the two studies are not comparable in a formal sense, the Court cannot say, on the basis of the record before it, that the conclusion reached in the Final Joint Environmental Impact Statement is a clear error of judgment. Thus, the Court finds that a mass transit alternative to I–670 was considered and reasonably rejected during the process of development of I–670.

## II.

Defendants have raised the issue whether plaintiffs have standing to bring this suit. Specifically, defendants contend that plaintiffs are asserting only a generalized public interest of the community in which they reside. Thus, defendants reason, plaintiffs lack the particularized injury that is a prerequisite to maintenance of federal litigation challenging official action.

██ So long as plaintiffs have asserted an actual injury resulting from the allegedly illegal acts of the defendants which can be redressed by favorable judicial action, they will have the requisite standing to prosecute this action. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Although generally parties to litigation must assert their own rights and not those of third persons, *Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–2206, 45 L.Ed.2d 343 (1975), a litigant asserting rights arising under a statute or regulation intended to protect the public is in a different situation. So long as the threshold requirement of an injury in fact is met, plaintiffs may assert the public interest or the interest of a community in support of their claim. *Sierra Club v. Morton,* 405 U.S. 727, 737, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972); *Environmental Defense Fund v. Tennessee Valley Authority,* 468 F.2d 1164, 1171–2 (6th Cir. 1972); *Citizens Committee Against Interstate Route 675 v. Lewis,* 542 F.Supp. 496, 522–4 (S.D.Oh.1982).

██ A further consequence of the principle that a litigant asserting rights under a statute intended to protect the public may assert the public interest is that only one plaintiff need have the requisite injury in fact. For, this one plaintiff will be able to assert all the deficiencies about which the others might complain. Thus, so long as one plaintiff has suffered the requisite injury in fact, it becomes "of no more than academic interest" whether the other plaintiffs have also suffered a similar injury. *Citizens Committee Against Interstate Route 675 v. Lewis, supra,* at 525.

■ At trial, plaintiff White, whose house is located some 360 feet from the proposed location for I–670, testified that the construction of I–670 would affect him adversely in several ways. First, he testified that construction and operation of I–670 would cause a loss of valuation of his property. Tr. 41. This likelihood was corroborated by the testimony of James Gabriel, former Columbus freeway engineer. Tr. 23. Second, plaintiff White testified that construction of I–670 would cause a loss to him in terms of the aesthetic value he places upon his community. "The deprivation of the use of an aesthetic resource is not merely an abstract injury ..." *Neighborhood Development Corp. v. Advisory Council on Historic Preservation*, 632 F.2d 21, 24 (6th Cir.1980).

Based upon this evidence, the Court concludes that plaintiff White has standing to bring this action. For the reasons stated above, it is academic to inquire whether other plaintiffs have standing as well. Thus, the Court concludes that the issue of standing must be resolved in favor of the plaintiffs. The Court emphasizes that this conclusion does not depend upon balancing of the injury to plaintiffs if I–670 were built against injury to defendants or the public if I–670 were not built. It is merely a question whether plaintiffs have met a threshold requirement.

### III.

In this part of this Opinion, the Court will address the merits of plaintiffs' claims in light of the facts, as found in part I. On the merits, plaintiffs contend that the defendants violated regulations promulgated under the Federal-Aid Highway Act, 23 U.S.C. §§ 101 *et seq.*, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* Before addressing the merits, however, the Court will first discuss the standard of review that must be applied in this case.

■ This case involves judicial review of administrative actions. Because of this, there are well-settled limitations upon the scope of review that must be observed by this Court. Unless the Court can conclude, from the whole record made in this case, that the defendants acted arbitrarily, capriciously or otherwise not in accordance with the law, *or* that defendants' actions failed to meet statutory, procedural or constitutional requirements, the agency actions must be upheld. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–7, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971); *Citizens Committee Against Interstate Route 675 v. Lewis*, 542 F.Supp. 496, 521 (S.D.Oh.1982); *Nashvillians Against I–440 v. Lewis*, 524 F.Supp. 962, 980 (M.D. Tenn.1981). The Court is not to conduct a *de novo* review, *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), nor is it to substitute its own judgment for that of the administrative officials. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 823. Although the Court's inquiry is to be "searching and careful," the Court cannot examine the merits or wisdom of the administrative action. *Id.* at 416, 91 S.Ct. at 824. Once the Court is satisfied that the defendants have taken a "hard look" at the impacts that the law mandates be considered, its inquiry is over. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

### A.

Title 23 of the United States Code imposes a number of procedural requirements upon projects that receive federal funding. 23 U.S.C. § 102. In the case of transportation planning in urban areas, special organizational and planning requirements are imposed by federal law. 23 U.S.C. § 134. In addition, in the case of a highway bypassing or going through any town or city, hearings must be held to allow affected persons to express any objections they may have to the proposed location of the highway. 23 U.S.C. § 128. And, federal law also imposes requirements that economic, social and environmental effects of any proposed project be fully considered in development of that project. 23 U.S.C. § 109. *See generally Township of Springfield v.*

*Lewis,* 702 F.2d 426, 430–1 (3rd Cir.1983). In the instant case, plaintiffs challenge compliance with regulations promulgated under §§ 128 and 109.

In 23 U.S.C. § 109(h), Congress directed the Secretary of Transportation to promulgate regulations "designed to assure that possible adverse economic, social, and environmental effects relating to any proposed project ... have been fully considered in developing such project." This provision has been interpreted as manifesting "Congress' clear intent to incorporate new values into the highway decision making process." *National Wildlife Federation v. Snow,* 561 F.2d 227, 234 (D.C.Cir.1976). To implement this Congressional directive, the Secretary of Transportation promulgated regulations, which are codified at 23 C.F.R. Part 795. Although these specific regulations have been repealed and are currently superseded by 23 C.F.R. Part 771, the parties agree that these regulations were required to be followed in the I–670 Project. Agreed Stipulations ¶ 10.

The general intent of these regulations is to state guidelines that are to be applied to the process by which highway agencies plan and develop federally aided projects. 23 C.F.R. § 795.4(a) (1974). Under the regulatory scheme, state highway agencies develop an Action Plan, which must be approved by the Secretary of Transportation, and must operate under that Plan. The regulations themselves impose certain requirements regarding the contents of Action Plans. 23 C.F.R. §§ 795.8–.17 (1979). These regulations at several places impose requirements of public involvement in the process of planning and development of highway projects. Plaintiffs allege that these requirements of public involvement have been violated.

The policy underlying public involvement in highway project planning and development is stated as follows:

The process by which decisions are reached should be such as to merit public confidence in the highway agency. To achieve this objective, it is the FHWA's policy that other agencies and the public

be involved in the system planning and project development early enough to influence technical studies and final decisions.

23 C.F.R. § 795.3(b)(2) (1974). In addition, the regulations declare that federal policy is that

full consideration be given to social, economic, and environmental effects throughout the planning of highway projects, including system planning, location, and design ...

23 C.F.R. § 795.3(a) (1974). The regulations define the "system planning stage" as "(r)egional analysis of transportation needs and the identification of transportation corridors." 23 C.F.R. § 795.2(e)(1) (1974). Construing the statements of policy above in light of this definition, it appears to be federal policy that there be both public involvement and full consideration of social, economic and environmental impacts beginning with the systems planning phase of a highway project, as that term has been defined earlier in this Opinion. The regulations contemplate public involvement as a means to ensure that the statutory mandate of full consideration of possible adverse economic, social and environmental is observed.

To implement this policy, the regulations state that an Action Plan should identify the assignment of responsibility and the procedures to be followed

to ensure that interested parties, including local governments and metropolitan, regional, State, and Federal agencies, and the public have an opportunity to participate in an open exchange of views throughout the system planning, location, and design stages.

23 C.F.R. § 795.10(b)(3) (1974). In addition, the Action Plan should contain procedures

to ensure adequate opportunity for public hearing(s) on the need for the proposed project; alternative courses of action; alternative project locations and major design features; social, economic, environmental and other effects of the alternatives; and the consistency of the

project with local planning goals and objectives.

23 C.F.R. § 795.10(b)(7) (1974).

These requirements of public involvement are reflected in the Ohio Action Plan. The Ohio Action Plan requires that during the systems planning phase

Alternative set of plans and programs must be presented to Citizens and Public Officials in the District so that they have the opportunity to suggest modifications to what is presented, or to suggest additional alternatives.

Jt. Ex. 39 at III–39. The Ohio Action Plan further requires that administrative staff

will show in the records of the Systems Planning Phase that the affected Citizens and Public Officials had opportunity (sic), through awareness of the process and how to participate in it, to contribute to the identification of its own needs.

Jt. Ex. 39 at III–24.

The Court can only conclude that both federal regulations and the Action Plan require that there be some reasonably formalized procedure by which interested and affected citizens could present their views throughout the development process. There is no basis in the regulations or the Action Plan for any suggestion that the systems planning phase is exempt from this requirement: indeed, the express language of both is plainly to the contrary. It is clear to the Court that the Citizens Advisory Committee of MORPC was created to comply with these requirements of the regulations and the Action Plan. The Court must now consider whether this attempt has succeeded.

■ Upon the record made in this case and for the following reasons, the Court concludes that the Citizens Advisory Committee, as implemented by MORPC, was not sufficient to comply with the public involvement requirements of Part 795. First, the defendants made no systematic attempt to solicit involvement in the CAC by persons in the general area where the highway would be built. The Court interprets "interested parties" in 23 C.F.R.

§ 795.10(b)(3) to include such persons. Defendants violated this regulation because they did not institute procedures to solicit the involvement of persons representing neighborhood groups in the affected area. Rather, as the record in this case makes clear, involvement in the CAC was left to informal contacts.

Second, the membership of the CAC was heavily weighted in favor of business and governmental groups. Although there was some involvement by civic groups, there appear to be no groups specifically representing the interests of neighborhoods in the affected area. See Jt. Ex. 86. Thus, as the Court construes the term, "the public" was inadequately represented.

Third, the Court considers it relevant that the Leonard-Maryland-Sunbury-I–670-17th Avenue Systems Analysis, Jt. Ex. 27, was narrowly conceived in that it focused relatively little upon social impacts and impacts upon racial minorities. This is significant because, as the Court construes the regulations, a main purpose of public involvement is to ensure that broader values are brought to bear on the highway planning process. The narrowness of the major study documenting the need for I–670 suggests that, to some extent, the objective of Congress in § 109(h) has not been realized.

Thus, the Court concludes that plaintiffs have carried their burden with respect to their claim that defendants provision for public input during the systems planning phase of the I–670 Project was inadequate to meet the requirements of the regulations promulgated under § 109(h).

The second error under the Federal Highway Act alleged by the plaintiffs is a violation of 23 U.S.C. § 128(a). In relevant part, this provides:

Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village ... shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social

effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.... Such certification shall be accompanied by a report which indicates the consideration given to the economic, social, environmental, and other effects of the plan or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered.

When this section was amended in 1968 to require consideration of social and environmental as well as economic impacts, the accompanying legislative history stated:

It is important that those who participate in the hearings believe that the views they express will be considered and weighed in decisions relating to highway location and design. These hearings are intended to produce more than a public presentation by the highway department of its plans and decisions.

Senate Public Works Comm., Federal-Aid Highway Act of 1968, Sen.Rep. No. 1340, 90th Cong., 2d Sess. reprinted in 1968 *U.S. Code Cong. & Ad.News* 3482, 3492 (1968).

Still, Congress did not intend that final decisions as to location or design of highways be made by participants at public meetings. Rather, these decisions "can only be made by governmental agencies designated by Congress and the respective State Legislatures to execute and implement the highway program." House Public Works Comm., Federal-Aid Highway Act of 1970, H.Rep. No. 91–1554, 91st Cong., 2d Sess., reprinted in 1970 *U.S.Code Cong. & Ad.News* 5392, 5396 (1970). It appears that Congress' intent is that highway planners should be publicly confronted with opposing views, to ensure they take account during the planning process of the desires and objections of citizens affected by proposed projects. *D.C. Federation of Civic Ass'ns., Inc. v. Volpe,* 434 F.2d 436, 441 (D.C.Cir.1970). Consequently, hearings are to be conducted as town-hall type meetings in which people are free to express their views. H.Rep. No. 91–1554,

*supra,* U.S.Code Cong. & Admin.News 1970, at 5396. In addition, "(t)he major focus must be on the total impact of the project as a whole, including whether it should be built at all ..." *Lathan v. Brinegar,* 506 F.2d 677, 690 (9th Cir.1974).

Plaintiffs refer the Court to FHWA regulations implementing § 128(a) for the proposition that hearings must be held

before the State highway department is committed to s specific proposal ... [to] ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the need for, and the location of, a Federal-aid highway ...

23 C.F.R. § 790.3(a)(1), (2). Plaintiffs argue that defendants violated these provisions because they waited until the systems planning phase was closed before holding public meetings. By this time, plaintiffs contend, the defendants were already committed to a specific proposal, viz., building I–670.

The plaintiffs have focused upon a problematic aspect of federal highway regulations. As the Court noted in *National Wildlife Federation v. Snow,* 561 F.2d 227 (D.C.Cir.1976):

FHWA hearing regulations recite that the "need" for the highway is for comment at a corridor public hearing. But by the time of this location phase, need has already been established to the satisfaction of those planning the highways. By the time a proposed route reaches the location phase—when a NEPA statement and the first public hearing are normally required—the route has already been put on a federal-aid system by the FHWA and has been included in the construction program submitted annually by the state. And prior to the time of submission of the construction program, the state will have made a determination as to the need for the highway projects included in the program, established project priorities, and coordinated these proposals with state and local planning. "Thus, although the need for [a highway] might be disputed, the determination

that it should be built has already been made by planners and politicians alike." *Id.* at 233–4, footnotes omitted.

The Court considers that the proper issue is whether public hearings are conducted "to assure consideration [of social, economic and environmental impacts] at a point that is meaningful." *Id.* at 234. That is, the planners are permitted to have a specific proposal and even to be promoting it. Unless there is a specific proposal to be discussed, it is difficult to see how meaningful public meetings could be held, for there would be no focus. However, planners are not permitted to have closed their minds to the social, economic and environmental impacts of their proposal. If these impacts are excessive, they must be willing to reconsider their project. In sum, the law requires good faith objectivity, not subjective impartiality. *Nashvillians Against I-440 v. Lewis*, 524 F.Supp. 962, 987 (M.D. Tenn.1981). As this Court understands the law, the purpose of public hearings to bring the planners face-to-face with public reaction to their proposals and projects.

 If there has not been substantial compliance with the requirements of § 128, an injunction will lie to block the highway project until there is compliance with the law. *Ward v. Ackroyd,* 344 F.Supp. 1202 (D.Md.1972); *City of Rye, New York v. Schuler,* 355 F.Supp. 17 (S.D. N.Y.1973). However, the defendants' actions are entitled to a presumption of regularity, and the burden is upon the plaintiffs to establish illegality. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 415, 91 S.Ct. at 823 (1971); *Pennsylvania Environmental Council, Inc. v. Bartlett,* 454 F.2d 613, 619 (3d Cir.1971). The sufficiency of the hearings that were in fact held is a question of fact for the Court to determine. *Joseph v. Adams,* 467 F.Supp. 141, 161 (E.D.Mich.1978).

As noted above, public involvement during the location phase was accomplished through the activities of the Citizens Advisory Group and I-670 Public Information Center, dissemination of newsletters and reports to the public, public meetings with

civic groups and groups within the I-670 corridor, and a formal public hearing that was held on October 1, 1980. *See* Jt. Ex. 25; Final Joint Environmental Impact Statement, Appendix A. Plaintiffs have stipulated that they were members of the Citizens Advisory Group, and presented their views on I-670 and alternatives to it. Agreed Stipulations, ¶ 71, 73. They have further stipulated that they were adequately notified of the public meetings conducted by the I-670 Coordinating Committee and the October 1, 1981 meeting, and that these meetings were fairly conducted and afforded them an opportunity to present their views. Agreed Stipulations, 79–84. The sole complaint raised by the plaintiffs is that, by the time public hearings were conducted, defendants were already committed to the I-670 Project. Specifically plaintiffs contend that by the time of the first public hearing on March, 1976, the defendants assumed that I-670 would be built and restricted public input to route locations and not the need for a freeway.

 Insofar as plaintiffs are contending that public hearings must be held before the systems planning phase is closed, their contention is without merit, for the reasons explained *supra* in this subpart of this Opinion. *See also Nashvillians Against I-440 v. Lewis, supra,* at 986–7.

 Alternatively, plaintiffs may be contending that defendants had so closed their minds to public input that, come what may, they would build I-670. Such conduct on the part of the defendants would, if proven, violate § 128(a) and its implementing regulations, as this Court construes these provisions. However, plaintiffs have failed to demonstrate such closed-mindedness or bad faith on the part of the defendants. Because the plaintiffs carry the burden of proof on this issue, their contention must fail.

The record in this case shows that the plaintiffs presented their criticisms of I-670 and proposed alternatives to it on many occasions in public meetings. The fact that the defendants did not adopt these alterna-

tives is not dispositive of the issue. The Court cannot conclude that it was a clear error of judgment for the defendants to prefer I–670 to the mass transit alternative put forth by the plaintiffs. The City Council funded restudy instituted at plaintiffs' urging concluded that mass transit was not a viable solution unless it was accompanied by construction of a major arterial street through the area. The plaintiffs have presented no expert testimony that tends to show the unreasonableness of this view. In light of this record, the Court can only conclude that plaintiffs have failed to demonstrate that the public hearings failed to meet the requirements of § 128.

Unlike the situation in *Joseph v. Adams,* 467 F.Supp. 141 (E.D.Mich.1878), upon which plaintiffs rely, the meetings held in the I–670 Project do not appear to have been merely informational meetings. In *Joseph v. Adams,* defendants did not hold public meetings until final construction plans were being formulated. It was clear that public comments were not considered for the purpose of altering the project. *Id.* at 161. The Court cannot reach similar conclusions from the record in the instant case. The main basis for plaintiffs' claim— that the defendants proposed and planned the highway prior to holding hearings— simply is not sufficient to show a violation of § 128. *See Nashvillians Against I–440 v. Lewis, supra,* at 986. Thus, the plaintiffs have failed to carry their burden regarding their § 128 claim.

### B.

Plaintiffs' second major contention before the Court is that the defendants have violated Title VI of the Civil Rights Act of 1964. This provides, in relevant part:

> No person in the United States shall, on the ground of race, color, or national origin ... be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. In *Guardian's Ass'n v. Civil Service Comm'n of the City of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), a majority of a sharply divided Supreme Court held that a private party could bring suit for prospective relief to enforce regulations under Title VI embodying a disparate impact standard without having to prove discriminatory intent on the part of the defendants. *See* fn. 27 to the Opinion of White, J. Thus, the Court reaffirmed the holding the *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) that discriminatory effect even in the absence of discriminatory purpose can violate Title VI.

Regulations promulgated by FHWA pursuant to mandate of Title VI provide:

> In determining the site or location of facilities, a recipient [of federal funds] may not make selections with the purpose or effect of excluding persons from, denying them the benefits of, or subjecting them to discrimination under any program to which this directive applies, on the grounds of race, color, sex or national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of Title VI of the Civil Rights Act of 1964 or this directive.

23 C.F.R. § 710.405(c)(3). This provision plainly contemplates that discriminatory effect can be a violation, even where there is no discriminatory purpose. Compare 49 C.F.R. § 21.5(d). Therefore, under *Guardian's Ass'n, supra,* if the construction of I–670 at the proposed location would have a discriminatory effect, Title VI will be violated, even though no discriminatory intent or purpose underlies the selection of that location.

Plaintiffs advance two alternative contentions to support their request that defendants be enjoined under Title VI from constructing I–670 as presently planned. First, they submit that defendants are precluded by 23 C.F.R. § 710.405(c)(3) from building a highway where the route selected would have a disproportionate impact upon minority citizens. Upon this contention, the cited regulation amounts to a *per se* prohibition against taking actions that have a disparate impact. Alternatively, plaintiffs contend, even though highways

can be built through predominantly minority neighborhoods, defendants have a duty to consider carefully alternatives with less discriminatory impact. Plaintiffs urge that defendants have failed to do so in the I–670 Project.

■ Plaintiffs' first contention—that the highway cannot be located where it will have a disparate impact upon minorities— must fail. Defendants are not *per se* prohibited from locating a highway where it will have differential impacts upon minorities. Rather, Title VI prohibits taking actions with differential impacts without adequate justification.

■ Under Title VI, plaintiffs must first establish that the proposed federally-aided administrative action involves "some definite, measurable disparate impact." *N.A.A.C.P. v. Medical Center, Inc.,* 657 F.2d 1322, 1332 (3rd Cir.1981). If plaintiffs meet this initial burden, defendants must present a justification for their actions. The ultimate burden of proving illegal discrimination remains with plaintiffs. *Id.* at 1333; *accord, Bryan v. Koch,* 627 F.2d 612, 616–8 (2d Cir.1980); *Wade v. Mississippi Cooperative Extension Serv.,* 528 F.2d 508, 516–7 (5th Cir.1976). The approach taken by the Court in *N.A.A.C.P. v. Medical Center, Inc., supra,* was cited with approval by the Sixth Circuit in *Jennings v. Alexander,* 715 F.2d 1036, 1045 n. 9 (6th Cir.1983). Thus, to determine whether locating I–670 as presently planned would violate Title VI, this Court must inquire whether plaintiffs have made a *prima facie* case, and, if so, whether defendants have offered sufficient justification for their actions.

■ Upon consideration of the record made in this case, the Court concludes that plaintiffs have made a *prima facie* showing of disparate effect upon racial minorities. There is no dispute that parts of I–670 would travel through neighborhoods that range from 50% to over 90% racial minorities. Agreed Stipulation ¶ 123. Further, of the 355 persons displaced by the construction of I–670, 260 or nearly 75%

are members of racial minorities. Agreed Stipulations ¶ 121. There is also ample evidence to support a finding that the disruptions and negative impacts of highway construction and after the highway is operating will fall primarily upon neighborhoods that are mostly comprised of minorities. Tr. 21–3. The Court finds defendant Damian's attempt to portray the benefits of I–670 to plaintiffs to be speculative and unsupported by the record. *See* Defendant Damian's Post Hearing Brief, at 67–8.

However, upon consideration of the record, the Court further concludes that the defendants have met their burden of justifying the location of I–670 by articulating legitimate nondiscriminatory reasons for the location. In the first place, it is plain from the record that construction of I–670 would have substantially less impact upon racial minorities than would the construction of a freeway along 17th Avenue, the major alternative location for a freeway. Tr. 179. In addition, defendants have selected a final location for the highway so as to minimize impacts upon minority neighborhoods. The selected alternative was aligned along Alum Creek and an existing railroad right of way to avoid dividing neighborhoods and to minimize displacement of persons and businesses. Jt. Ex. 25: Final Joint Environmental Impact Statement, at III–25; Tr. 179–182. Thus, the final location avoids most of the neighborhoods that are 90% racial minorities. Tr. 182.

There is an alternative reason why the Court concludes that defendants have carried their burden. In *Jennings v. Alexander, supra,* at 1045, the Sixth Circuit wrote that one way in which the defendants could rebut a *prima facie* case of discrimination was to demonstrate that the alternative method offered by plaintiffs would not accomplish the objective sought. In the instant case, plaintiffs put forth an alternative solution to the acknowledged transportation problems of the northeast corridor. This alternative involved a combination of light rail transport and improvements to streets in the area. In the restudy funded by the City Council, this alternative was

considered and found wanting. Although that restudy did conclude that the construction of a freeway was not the only feasible solution to the transportation problems of the area, it appears clearly in the record that plaintiffs' alternative was considered to be inadequate.

Plaintiffs' alternative contention is that defendants were under a duty imposed by Title VI to formulate and inquire into alternatives with less disparate impact upon racial minorities, if the alternatives they are considering have any disparate impact at all upon minorities. This, plaintiffs contend, the defendants have failed to do. It is true that all of the reasonable alternatives for the location of I–670 had moderate or high negative impact upon racial minorities. Jt. Ex. 50 at 16. In addition, James Gabriel, Columbus expressway engineer during the location and design phases of the I–670 Project, testified that a "very indirect route" could have gone around "some" of the affected neighborhoods, and that the City did not investigate or prepare cost estimates for these indirect routes. Tr. 17–8. From these facts, the plaintiffs would have the Court conclude that the defendants failed to comply with the mandates of Title VI.

If plaintiffs' alternative contention arose under Title VI alone, there would be some question whether defendants were required by federal law to consider alternatives with less disparate impact. *See Bryan v. Koch, supra,* at 618–9; *N.A.A.C.P. v. Medical Center, Inc., supra,* at 1336–7. However, the Court need not decide this issue, for regulations promulgated by the FHWA impose such a duty. These provide:

Appropriate alternatives which might minimize or avoid adverse social, economic, or environmental effects should be studied and described, particularly in terms of impacts upon specific groups and in relationship to 42 U.S.C. § 2000d–2000d–4 (Title VI of the Civil Rights Action of 1964) and 42 U.S.C. 3601–3619 (Title VIII of the Civil Rights Act of 1968).

23 C.F.R. § 795.9(a) (1974). Thus, federal law at the time of the location phase of the I–670 Project imposed the requirement that defendants consider "appropriate" alternatives that might minimize adverse impact upon racial minorities.

■ Upon consideration of the record, the Court concludes that the plaintiffs have failed to show that there were any *appropriate* alternatives to be considered. The "very indirect route" elicited at trial remains wholly speculative. The Court has no conception of its location, and there is no indication whatsoever of the economic cost, or social or environmental impacts of such a location. This Court considers the comments of Judge Rice regarding a plaintiff's burden in challenging the sufficiency of an environmental impact statement to be applicable in the present context:

To prevail on the merits, Plaintiffs are required to establish that an Environmental Impact Statement is inadequate and that alternatives they propose are reasonable and feasible; more than a prima facie showing of deficiencies is necessary.

*Citizens Committee Against Interstate Route 675 v. Lewis,* 542 F.Supp. 496, 522 (S.D.Oh.1982). Furthermore, plaintiffs did not present this "very indirect route" to the defendants in the first instance for their consideration. Tr. 107–109. It is doubtful that plaintiffs can present an alternative in this Court in the first instance. *See Vermont Yankee Nuclear Power Corp. v. National Resources Defenses Council, Inc.,* 435 U.S. 519, 553–555, 98 S.Ct. 1197, 1216–1217, 55 L.Ed.2d 460 (1978); *Crosby v. Young,* 512 F.Supp. 1363, 1375 (E.D.Mich.1981).

In addition, the Court considers it relevant that the defendants did in fact consider the possibility of mass transit alternatives to I–670 in the City Council funded restudy in 1978, and did so at plaintiffs' urging. This alternative was designed to minimize impact upon neighborhoods in the northeast corridor, and, the Court assumes, would have minimized impact on racial minorities. Plaintiffs' proposed alternative

was considered in detail in the 1978 restudy. Tr. 110. In light of this, the Court can only conclude that alternatives with less impact upon minorities were in fact considered.

It follows that plaintiffs have failed to prove a violation of Title VI under either of their alternative theories.

## IV.

The Court has determined that defendants violated regulations under 23 U.S.C. § 109(h), but that, in all other respects, plaintiffs have not shown that the defendants have violated the law. Accordingly, the Court must now consider the issue of what relief, if any, should be granted to plaintiffs. In their complaint, plaintiffs seek both declaratory and injunctive relief.

Because plaintiffs have shown that the actions and conduct of the defendants during the systems planning stage of the I-670 Project violated the public involvement requirements imposed by Part 795 of Title 23 of C.F.R., it appears that declaratory relief is appropriate. 28 U.S.C. § 2201.

 However, in light of the record and the governing law, the Court concludes that an injunction prohibiting the beginning of construction of I-670 cannot issue. It is clear that a violation of § 109(h) by itself does not compel the issuance of an injunction until the noncompliance is cured; rather, the Court must balance the equities of the parties and the interest of the public. *See Essex County Preservation Ass'n v. Campbell,* 536 F.2d 956, 962-3 (1st Cir. 1976); *compare Nashville I-40 Steering Committee v. Ellington,* 387 F.2d 179, 182-4 (6th Cir.1967), *cert. denied* 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed.2d 982 (1968). Plaintiffs must show not only that a violation occurred, but also that they were prejudiced by this violation. *Orange County v. North Carolina Dept. of Transportation,* 46 N.C.App. 350, 265 S.E.2d 890, 911 (1980). Upon the record of this case, it is plain to the Court that plaintiffs were not prejudiced. Plaintiffs' preferred alternative was considered in detail in the 1978 City Council funded restudy. The Court

considers that any error committed by the defendants must be considered to be technical in nature in light of this.

**WHEREUPON,** upon consideration and being duly advised, this Court determines and hereby **DECLARES** that the actions and conduct of defendants during the systems planning phase of the I-670 Project violated the public involvement requirements of 23 C.F.R. Part 795; the Court further determines that upon all other claims, the Clerk shall enter **JUDGMENT FOR DEFENDANTS.**

IT IS SO ORDERED.