TOWN OF FENTON, Plaintiff,

v.

Elizabeth M. DOLE, United States Secretary of Transportation; John G. Bestgen, Regional Administrator, Federal Highway Administration, U.S. Department of Transportation; Victor E. Taylor, Division Administrator, Federal Highway Administration, U.S. Department of Transportation; Franklin E. White, Commissioner of the New York State Department of Transportation; Donald N. Geoffrey, Regional Engineer, Region I, New York State Department of Transportation, Defendants.

No. 72–CV–254.

United States District Court, N.D. New York.

March 19, 1986.

Hinman, Howard & Kattell, James M. Hayes, James F. Lee, Albert J. Millus, Jr., of counsel, Binghamton, N.Y., for plaintiff.

Frederick J. Scullin, Jr., U.S. Atty., N.D. of N.Y., William Fanciullo, Asst. U.S. Atty., Kenneth Dymond, Asst. Regional Counsel, Albany, N.Y., for the U.S. Dept. of Transp., defendants.

Robert Abrams, Atty. Gen., James M. Zaccaria, Asst. Atty. Gen., William S. Mac-Tiernan, Associate Atty. N.Y. State Dept. of Transp., Albany, N.Y., for New York State Dept. of Transp., defendants.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

After years of planning, debate, reconsideration and the preparation of Environmental Impact Statements [EIS]s, the Secretary of the United States Department of Transportation [USDOT] has made a final selection of a route for the construction of the I–88/I–81 Connector at the southwest end of I–88 which will complete the last segment of Route I–88 between Schenectady and Binghamton, New York. Plaintiff, the Town of Fenton, opposes the selection of the connector route chosen from the alternatives considered and has moved for a preliminary injunction to prevent the construction of the selected route, known as the "Modified River Crossing".

## I.

In December, 1968 the Federal Highway Administration of the USDOT [FHWA] approved the development of a highway for inclusion in the Interstate Highway System to be designated Interstate Route 88 [I–88] connecting I–90 in Schenectady, New York to I–81 north of Binghamton, New York, a distance of approximately 130 miles. The existing highway at that time between the Albany and Binghamton areas was Route 7 which remained essentially as it was constructed forty to fifty years prior; it was not regarded as a modern highway and was deemed deficient for medium and long distance travel and inadquate to serve future projected traffic demands.[1] Interstate Route 88, a limited-access highway was intended to provide adequate capacity to carry the forecasted traffic volume and a high degree of comfort and safety for the traveler between Albany and Binghamton. Administrative Record [A.R.] 1, p. CS–2.

Local citizen groups and individuals commenced this action in May 1972 seeking to enjoin the construction of I–88 until the state and federal Departments of Transportation complied with various environmental statutes.[2] The late Judge Port of this court issued a preliminary injunction on November 14, 1973 restraining the FHWA from (1) disbursing any further funds for construction of those sections of the project which were then currently under construction but for which EISs has not been filed, and (2) granting Plans, Specifications, and Estimates [PS & E] approval for those segments for which EISs had not been filed.[3]

As the defendants completed EISs, Judge Port, in a series of orders, released

---

1. Route 7 did not meet "modern design standards for width, curvature and sight distance. Although it can generally be said to serve local traffic needs, the medium and long distance traveler is severely hampered by reduced speed zones, substandard alignment, numerous intersecting streets and adjoining commercial and residential development." Administrative Record [A.R.] 1, p. CS–2.

2. Plaintiffs' complaint alleged violations of the National Environmental Policy Act, the Federal-Aid Highway Act, the Department of Transportation Act, the Federal Clean Air Amendments

of 1970, portions of Title 33 of the U.S. Code relating to Navigation and Navigable Waterways, New York state environmental and transportation laws, and the United States and New York Constitutions.

3. Plans, Specifications and Estimates approval is an action by the Secretary of Transportation prior to construction bidding and the award of the construction contract by which the federal government becomes contractually obligated for payment of the costs of the project approved. 23 U.S.C. § 106(a).

all segments of the project from the injunctive restraint with the exception of PIN 9357.18, the remaining unconstructed section of I–88 known as the I–88/I–81 connector which is the subject of the present controversy before the court. A final EIS [FEIS] on PIN 9357.18 was issued on October 3, 1983. The Secretary of Transportation issued her Record of Decision [ROD] on September 20, 1984 indicating her final selection from among the alternative routes for the Connector.[4] Defendants thereafter moved to vacate the injunction to allow construction of the selected route for this final segment of I–88. The Town of Fenton, which had been granted leave to intervene on October 31, 1979, opposed the defendants' motion and filed a cross-motion for the issuance of a superseding preliminary injunction. Finding that the equitites had shifted upon defendants' apparent compliance with the National Environmental Policy Act [NEPA] by completing the FEIS, this court on April 10, 1985 vacated Judge Port's order enjoining the FHWA from approving the plans for construction of PIN 9357.18. The Town of Fenton was granted leave to file an amended complaint on the same date.

A hearing on the plaintiff Town of Fenton's motion for a preliminary injunction consolidated with a trial on the merits was held on July 2, 1985. Briefs were subsequently submitted by the parties. Plaintiff presented no testimony at the hearing but introduced into evidence the Administrative Record and documents obtained through discovery. Plaintiff makes the following arguments in support of its motion for a preliminary injunction:

(1) The Secretary of Transportation erroneously determined that there exist no prudent and feasible alternatives to the route chosen which traverses a public park and will destroy a historic site in violation of § 4(f) of the Department of Transportation Act of 1966, recodified in 49 U.S.C. § 303, and § 18(a) of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138.

(2) The public hearing held by the New York State Department of Transportation ["NYSDOT" or "State DOT"] did not comply with 23 U.S.C. § 128 because the State DOT had irrevocably committed itself to the selected route prior to holding the statutorily mandated public hearing.

(3) The FEIS insufficiently sets out facts which would allow for a fully-informed choice on the route to be selected in contravention of NEPA, 42 U.S.C. §§ 4331–35.

(4) The state and federal defendants, as evidenced by the FEIS, failed to give sufficient consideration to environmental effects of the proposed highway construction, in violation of NEPA.

### HISTORY OF I–88 CONNECTOR

Studies and planning for the I–88/I–81 Connector proceeded separately from the planning for the remainder of I–88. Preliminary reports developing and analyzing alternative routes for the Connector were prepared and circulated among federal and state DOTs and federal, state and local agencies from May 1972 through 1977. NYSDOT and FHWA prepared an EIS issued in August of 1977 which discussed six alternatives for construction. Project Report V, A.R. 2. The proposed route was a river crossing alternative north of the route currently proposed. Local officials requested a reevaluation of locations for the Connector; the 1977 EIS was withdrawn. NYSDOT hired an independent consulting firm, Tippetts, Abbott, McCarthy-Stratton [TAMS] to study alternative routes.

In 1980 NYSDOT and FHWA decided to prepare a new EIS to study alternatives for the Connector. Public participation in the planning process was sought through the involvement of the Binghamton Metropolitan Transportation Study [BMTS] Policy Committee of the designated Metropolitan Planning Organization pursuant to 23

---

**4.** The Secretary of the U.S. Department of Transportation is currently Elizabeth M. Dole.

This opinion refers to action by her predecessors in office as if it were action by her.

U.S.C. § 134,[5] and the Community Advisory and Review Team [CART]. BMTS was comprised of local officials and state commissioners; CART was made up of local officials of potentially-affected communities: Binghamton, Port Dickinson, Chenango, Fenton, Dickinson, Kirkwood, Colesville and Windsor. CART met six times from October 1980 to June 1981 but reached no agreement on a preferred route for the Connector. When BMTS could not reach an agreement on a preferred route, BMTS created an Ad Hoc Committee, which included the CART representatives, to make recommendations to BMTS. The Ad Hoc Committee held five meetings in which each affected community presented and discussed their concerns as outlined in the FEIS (Chapter 10). A strong area of disagreement among the communities was in the location at which the Connector would cross the Chenango River to connect with I–81 on the west side. Though some of the towns objected to particular locations for the crossing of the Connector over the Chenenago River, the Town of Fenton remained opposed to any crossing of the Chenango River. The committee considered the alternatives, and at the final meeting of the Ad Hoc Committee on June 28, 1982 the Committee endorsed the Modified River Crossing alternative. The Committee's en-

dorsement was presented to the BMTS Policy Committee on July 1, 1982 at which time BMTS adopted Resolution 82–3 endorsing the Modified River Crossing route. NYSDOT requested authorization to hire a consultant to design the proposed Connector on September 29, 1982. A draft EIS [DEIS] was prepared in November 1982 which was circulated for review and comment to various agencies and to the public. Following receipt of comments on the DEIS and a public hearing as mandated by 23 U.S.C. § 128, the FEIS was issued in October 1983. The ROD of the Secretary was issued on September 20, 1984.

The three build alternatives considered are as follows:

*Modified River Crossing*

From Port Crane, this alternative would proceed along existing Route 7 to a crossing of the Chenango River on a new bridge located at the Town of Fenton/Town of Dickinson line. It would tie into Interstate 81 in the Town of Chenango near the Town of Dickinson line. The 2.5 mile, four lane divided highway would have some sections of depressed roadway in constricted areas. Service roads adjacent to the connector roadways would maintain local access. Interchanges with grade separation structures and access

---

**5.** This statute provides:
Transportation planning in certain urban areas

(a) It is declared to be in the national interest to encourage and promote the development of transportation systems embracing various modes of transportation in a manner that will serve the States and local communities efficiently and effectively. To accomplish this objective, the Secretary shall cooperate with the State and local officials in the development of transportation plans and programs which are formulated on the basis of transportation needs with due consideration to comprehensive long-range land use plans, development objectives, and overall social, economic, environmental, system performance, and energy conservation goals and objectives, and with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population. The planning process shall include an analysis of alternative transportation system management and investment strategies to make more

efficient use of existing transportation facilities. The process shall consider all modes of transportation and shall be continuing, cooperative, and comprehensive to the degree appropriate based on the complexity of the transportation problems. After July 1, 1965, the Secretary shall not approve under section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section. No highway project may be constructed in any urban area of fifty thousand population or more unless the responsible public officials of such urban area in which the project is located have been consulted and their views considered with respect to the corridor, the location, and design of the project.
23 U.S.C. § 134.

ramps would be constructed at Route 12A and Fenton and Phelps Street in Port Dickinson.... The Chenango Street interchange in Port Dickinson would be reconstructed. The existing Route 12A and the Delaware and Otsego Railroad bridges would be replaced.

*Modified Brandywine.* This alternative would follow existing Route 7 (Brandywine Highway) for 4.3. miles through the Town of Fenton and Village of Port Dickinson into the City of Binghamton (North Side) where it would connect with Interstate 81 at the I–81/Route 7 interchange. It would have the same alignment and construction features in Fenton as the Modified River Crossing alternative but would continue south of Phelps Street without service roads. Grade separation structures would be provided at Chenango Street, Phelps Street and Old State Road in the Village of Port Dickinson. Local street improvements would be made in the vicinity of Bevier Street along with modification and widening of access ramps at the I–81/Route 17/Route 7 interchange.

*Fox Hollow A–B.* This alternative would depart from existing I–88 just west of the Sanitaria Springs exit and proceed south across a rural area in the Towns of Fenton, Colesville and Kirkwood. It would connect with I–81/Route 17 in the vicinity of Colesville Road. There are no intermediate interchanges throughout its 4.4 mile length. A grade separated structure would join the connector's southbound roadway at its northerly terminus to I–88. Other grade separation structures would be required where the connector crosses Route 7, the D & H railroad, Fuller Road, Old State Road, and Stratmill Road. The connector would join I–81/Route 17 with grade separation structures and ramps, developed to be compatible with Colesville Road/I–81 access improvements.

In addition, a no-action alternative was evaluated:

*No Action.* A No-Action alternative was assessed which assumed the continuation and maintenance of existing facilities, the continuation of existing transportation policies, and the completion and maintenance of committed projects within the project corridor and the region. These projects include Routes 11 and 12 Town Line Extensions in the Town of Chenango, and the Colesville Road reconstruction in the Town of Kirkwood.

FEIS, A.R. 12, pp. i-ii.

## II.

Plaintiff argues that the Secretary's selection of the Modified River Crossing route which requires the use of public park land violates § 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303 and 23 U.S.C. § 138. The proposed highway will pass through the Village of Port Dickinson Recreational Area, a "public park ... of local significance", *id.*, and will destroy a national historic site of the Owasco Indians, both of which areas are protected by § 4(f). The statute dictates that the Secretary shall not approve a project which will harm a park, recreation area, or historic site unless it is determined that "there is no feasible and prudent alternative to the use of such land." *Id.* The statute imposes the additional obligation on the Secretary of assuring that a project include "all possible planning to minimize harm to such park, recreational area ... or historic site resulting from such use." *Id.*

Plaintiff argues that the Secretary's selection of the Modified River Crossing route violates § 4(f) because the Fox Hollow alternative constitutes a "feasible and prudent" alternative. Plaintiff argues that the Secretary exceeded her scope of authority in her determination that no feasible and prudent alternative to the Modified River Crossing route exists; that she could not have reasonably believed that no feasible and prudent alternative to the Modified River Crossing route exists or that Fox Hollow presented unique problems; and her determination was not based on rele-

vant factors thereby evidencing a clear error of judgment.

■ Judicial review of the Secretary's decision with respect to § 4(f) is governed by the Administrative Procedure Act, 5 U.S.C. § 706. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136; *Sierra Club v. United States Corps of Engineers*, 772 F.2d 1043, 1050 (2d Cir.1985). The first determination to be made by the court is whether the Secretary acted within the scope of her statutory authority under § 4(f): whether the Secretary properly construed her authority to approve the use of parklands as limited to situations where there are no feasible alternatives or where feasible alternative routes involve uniquely difficult problems. *Overton Park*, 401 U.S. at 415–16, 91 S.Ct. at 823–24. Second, the court must determine whether the actual choice made was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. "The final inquiry is whether the Secretary's action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. at 824.

### A.

Plaintiff argues that the Secretary exceeded the scope of her authority by failing to construe her authority to approve a route which will use parklands as limited to only those situations in which the feasible alternative routes present uniquely difficult problems. Plaintiff argues that the Secretary misconstrued her authority by engaging in an improper balancing of the overall advantages and disadvantages of the alternative routes against the Modified River Crossing. Had the Secretary engaged in a proper inquiry, plaintiff asserts that she would have found Fox Hollow to be a feasible and prudent alternative presenting no unique problems.

■ Under § 4(f) parklands may be used for a project only where the Secretary finds that no "feasible and prudent" alternative exists. No separate findings were made by the Secretary in this case that each alternative was neither "feasible" nor "prudent." Rather the Secretary found that on the whole none was "feasible and prudent." A "feasible" alternative is a route which as a matter of sound engineering is capable of being built. *Overton Park*, 401 U.S. at 411, 91 S.Ct. at 821. The alternatives considered were all capable of being built. The Secretary rejected the alternatives based on stated disadvantages. *See* ROD, A.R. 20. The Supreme Court has declared that based on the "paramount importance" given to the protection of parkland under § 4(f), the Secretary is not to approve a route which destroys parkland "unless he finds that alternative routes present unique problems." *Overton Park*, 401 U.S. at 413, 91 S.Ct. at 822. In this way the court interpreted the scope of authority and discretion granted to the Secretary's determination of whether there exists a "prudent" alternative under § 4(f) as more limited than that urged by the Secretary in *Overton Park* of a wide-ranging balancing of the cost of other routes, safety considerations, and other factors against the detriment resulting from the destruction of parkland. *Id.* at 411–13, 91 S.Ct. at 821–22.

■ In this case the Secretary did not explicitly find that Fox Hollow and the other alternatives presented "unique problems." However, failure to use these words does not inexorably lead to a conclusion that the Secretary failed to stay within the bounds of her statutory discretion. The Secretary rejected the alternatives based on specified disadvantages. Specifically in the Record of Decision, the Secretary stated that the Modified Brandywine Alternative was rejected because of its anticipated adverse effects on traffic and safety on other routes, number of residential displacements which it would cause, high cost of construction and "highly detrimental" noise levels in adjoining populated areas. The Fox Hollow A–B alternative was rejected because of its severe intrusion on the surrounding rural environment through which the route would pass, with

accompanying destruction of natural vegetation and damage to scenic beauty and wildlife habitat, the great quantity of land required for construction of which much is active agricultural land, the minimal resulting improvement of regional traffic on other routes, the high cost of construction and increase in noise levels. Specific disadvantages individually considered as to each alternative may suffice for the Secretary to properly find that an alternative is not prudent. Therefore this court holds that the Secretary did not exceed the scope of her authority under § 4(f) in approving the Modified River Crossing route which requires the taking of parkland based on a finding that the alternatives were not feasible and prudent.

■ The Modified River Crossing route would also disturb a portion of a prehistoric Owasco Indian site found within the Port Dickinson Recreational Area in September 1982. Excavation revealed artifacts including flint flakes, ceramics and a projectile point. Survey reports were submitted to the State Historic Preservation Officer [SHPO]; the site has been determined eligible for the National Register of Historic Places. The FHWA and NYSDOT in cooperation with the SHPO adopted a plan for mitigation which has received the approval of the Advisory Council on Historic Preservation. This plan calls for sampling, excavation and preservation of any identified artifacts prior to construction. This mitigation plan is in accordance with the Secretary's statutory duty under § 4(f) to minimize harm to historic sites.

The Secretary also has a statutory duty to minimize harm to the parkland resulting from the route chosen. NYSDOT intends to purchase an undeveloped seven-acre parcel of land north of the recreational area which will be deeded to the Village of Port Dickinson after construction of the roadway. Because the roadway will cut short the outfield of the "Babe Ruth" regulation size ballfield, the ballfield will be relocated and reseeded. NYSDOT will assist with construction of the recreational area, which at the time EISs were issued was still in

the early stages of development, as compensation for the use of the land. These measures include: clearing, grading, and surfacing of the following areas: trails along the periphery of the park, a teen center, and the park entrance. The majority of the land taken as a right of way for the Connector through the park will be available for park use. The bridge transecting the park will be at least 15 feet high; the area under the bridge will be paved and lighted and will allow for unrestricted access between the north and south sections of the recreation area. It is promised that construction will be undertaken in such a manner as to minimize impacts on the recreational area during the construction period.

■ Contrary to plaintiff's allegations, the record indicates that the Secretary gave serious consideration to the fact that the Modified River Crossing alternative finally selected requires the use of parkland. In addition to the final Modified River Crossing alternative, two variations of this route were considered in earlier planning stages. Though locating the actual river crossing slightly to the north or to the south would have avoided the parkland, these options were eventually rejected because of "other significant disruptive consequences" including displacement of residents and businesses, destruction of wetlands, and the Town of Fenton's interest in minimizing any adverse impact on the tax base which could not be achieved by either of the options.

The Modified River Crossing alternative was adopted as the environmentally preferred alternative because of its fewer negative environmental impacts of important consequence despite its effect on parkland. Also, this was the sole alternative which alone met the project goal, in addition to connecting I–88 and I–81 by way of an interstate highway-quality road, of improved traffic and safety on local routes in the area surrounding the Connector. While there was no explicit finding that each alternative not requiring the use of parkland presented "unique circumstanc-

es", the record does not indicate that the Secretary merely weighed the cost and other detriments of alternatives against the use of parkland in the Modified River Crossing as prohibited under *Overton Park.*

The Record of Decision, the FEIS and other documents made a part of the administrative record documenting the planning process all indicate that the Secretary accorded great importance to the preservation of the parkland now required for use by the Modified River Crossing alternative finally selected. The court concludes therefore that the Secretary fulfilled her statutory duty under § 4(f) of according paramount importance to parkland and of not approving a project which requires the use of parkland unless there exists no feasible and prudent alternative.

### B.

Plaintiff next challenges the Secretary's determination that no feasible and prudent alternative to the Modified River Crossing exists. Plaintiff argues at great length that Fox Hollow is a feasible and prudent alternative and presents no unique problems. The Secretary's choice cannot be approved by this court if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823. The court's review in this regard involves a consideration of whether the Secretary's decision to approve the Modified River Crossing alternative was based on a consideration of relevant factors and whether there has been a clear error of judgment. *Id.*

■ Plaintiff's attack on the reasonableness of the Secretary's finding that Fox Hollow is not a feasible and prudent alternative is made by arguing that each factor relied upon by the Secretary was based on an incorrect factual conclusion and that the Secretary did not make a finding that any one factor constituted a "unique circumstance" justifying the rejection of the alternatives under § 4(f). Rather, she found

that based on several factors in combination the alternatives to the Modified River Crossing route were not feasible and prudent. Contrary to plaintiff's position, this court is not of the view that each factor independently must provide a sufficient basis for the Secretary's conclusion that an alternative not involving the taking of parkland is not feasible and prudent. If the several factors relied upon are proper for consideration under § 4(f) and their consideration in combination with each other can reasonably be said to not evidence a clear error judgment on the part of the Secretary, the Secretary's determination that an alternative is not feasible and prudent must be left undisturbed.

■ The Secretary's Record of Decision indicates that the endorsement of the Modified River Crossing alternative by the BMTS was given great weight in the FHWA's decision-making process. Plaintiffs cite two cases in support of the proposition that the Secretary's determination under § 4(f) is to be made independently of political pressures. *D.C. Federation of Civic Associations v. Volpe,* 459 F.2d 1231, 1245–46 (D.C. Cir.1971), *cert. denied* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); *Citizens to Preserve Overton Park v. Volpe, on remand* 335 F.Supp. 873 (W.D. Tenn.1972). However, in this case the recommendation was not from elected officials per se but rather from a local planning organization mandated by 23 U.S.C. § 134. This statute requires the Secretary in approving projects in any urban area of more than 50,000 people to consider the view of responsible local officials expressed as part of a "continuing comprehensive transportation planning process." 23 U.S.C. § 134; *see infra* n. 5. These officials are to be consulted with respect to the "corridor, the location and design of the project." *Id.* In this case the BMTS is the officially designated Metropolitan Planning Organization under 23 C.F.R. § 450.106. Reliance on the endorsed preference of the BMTS is not inappropriate under § 138. The legislative history for the Federal-Aid Highway Act of

1968 indicates Congress' intent that the community's preferences are to be considered by the Secretary:

LOCAL RESPONSIBILITY IN HIGHWAY DECISIONS

The importance of the involvement of local officials in route selection, the public hearing process, and the resolution and establishment of community goals and objections cannot be overstated. Many of the controversies of which the committee has been informed during its recent series of hearings could have been ameliorated, if not eliminated, had local officials been brought into the discussions at a sufficiently early stage in the hearing process.

Currently revised practices and procedures now look to such local participation. This should contribute substantially to better communication and understanding by the people of the communities through which highways are proposed to be constructed. Every effort should be made to encourage these officials to assume their share of the responsibility relating to highway decisions. With respect to a number of proposals contained in S. 3418, as reported, local authorities would be vital participants.

Sen.Rep. No. 1340, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. Code Cong. & Ad. News 3482, 3492.

This amendment of both relevant sections of law [23 U.S.C. § 138 and § 4(f) the Department of Transportation Act] is intended to make it unmistakably clear that *neither* section constitutes a mandatory prohibition against the use of the enumerated lands, but rather, is a discretionary authority which must be used with both wisdom and reason. The Congress does not believe, for example, that substantial numbers of people should be required to move in order to preserve these lands, or that clearly enunciated local preferences should be overruled on the basis of this authority.

Conf.Rep. No. 1799, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. Code Cong. & Ad. News 3531, 3538. Rather than harmonize

§ 134 with § 138, the plaintiff's position that the Secretary should not consider the BMTS' views as a factor in her determination under § 138 would mean that § 134, taken according to its literal language, would completely supersede § 138. A proper reading of both statutes in combination indicates that the views of the BMTS need not be completely disregarded in the Secretary's determination under § 138. The BMTS may express its views of what routes would best serve the community's needs; it remains the Secretary's duty to assure that her decision complies with her statutory obligation under § 138. Therefore the expressed preference of the BMTS was properly considered as a factor in the Secretary's decision under § 138.

The Fox Hollow route was rejected as not being a feasible and prudent alternative based on traffic and safety, cost and environmental considerations. The court will first consider plaintiff's challenge to the conclusion of the Record of Decision as to traffic effects in which plaintiff argues the conclusions are incorrect and not supported by the Administrative Record. Alternatively, even if the conclusions are true, plaintiff argues such a finding does not support a rejection of Fox Hollow because by themselves the traffic problems cannot be said to constitute uniquely difficult problems.

■ Improving traffic safety and maximizing level of service were important criteria in selection of a route for this project. Currently Route 7 into which I–88 now feeds has dangerous intersections with high accident rates. One objective of the project is to divert traffic away from Route 7. Similarly the existing I–81/Route 17/Route 7 interchange was deemed deficient in terms of operation and safety. The Secretary determined that the Fox Hollow alternative would probably worsen existing and anticipated future problems with the I–81/Route 17 overlap without significantly improving regional traffic service. Plaintiff argues that the Fox Hollow alternative should not have been rejected because it would reduce the level of use of Route 7.

It is acknowledged in the FEIS that the Fox Hollow route would divert much of the current traffic from Route 7. However the conclusion in the FEIS is that anticipated future volume of traffic on Route 7 would be reduced only slightly from the 1980 volume. In addition, there would be no improvement of the dangerous intersections along Route 7 because the Fox Hollow alternative would be constructed along an entirely different route leaving Route 7 unimproved.[6] By contrast, the Modified River Crossing route which follows part of what is currently Route 7 would upgrade part of Route 7 to interstate highway standards. The inability of the Fox Hollow alternative in remedying traffic and safety problems is amply supported in the record. This factor was very appropriately considered by the Secretary because it was one of the primary objectives of the project.

Plaintiff argues that the Secretary erroneously rejected the Fox Hollow alternative because of its adverse environmental impacts. Plaintiff points to the Corridor Reanalysis issued in 1975 which concluded that the adverse impact of the Fox Hollow alternative on the rural character is anticipated to be marginal. A.R. 17, p. VI–4. The FEIS issued in 1983 had a different conclusion: "It would seriously alter the rural environment ..." A.R. 12, p. 6–8. Plaintiff argues that this inconsistency between the 1975 and the 1983 reports necessitates a finding that the Secretary's conclusion that the Fox Hollow route would adversely affect the quality of the rural

environment through which it would pass is arbitrary and capricious. The effect on the environment cannot be based on firm objective criteria; as noted in the Corridor Reanalysis, aesthetic perceptions among people differ.[7] As asserted by plaintiff, the primary segment of I–88 was constructed through rural areas. The FEIS for that project was issued in 1976. Contrary to plaintiff's position, this court will not insist that the views as to the propriety of constructing an interstate highway along rural land must remain stagnant over time. Particularly as rural areas near metropolitan areas decrease, the Secretary is well within her proper discretion to attach greater importance now than in the past to the preservation of land in its present rural state. The preservation of the rural quality of the land to be used for the Fox Hollow route was a particular expressed concern of the federal agencies commenting on the DEIS. *See* FEIS, A.R. 12 pp. 7–6, 7–9. The Secretary's consideration of the detrimental effect of the Fox Hollow route on the land on which it would be constructed is not arbitrary or capricious.

Even if the Fox Hollow alternative is recognized as posing adverse consequences to the rural land, plaintiff argues that the Secretary should have considered efforts to mitigate the level of intrusion of Fox Hollow on the environment. Such mitigative efforts were made for the main portion of I–88. *See id.* at 5–45. Mitigation is not the same as eliminating all ad-

**6.** The traffic and safety deficiencies of existing Route 7 including particularly at the I–81/Route 17/Route 7 interchange are well documented in the record. *See* FEIS, A.R. 12, pp. 7–25, –67; A.R. 6, p. 7–10.

**7.** –aesthetic analysis
One aspect of highway construction that has received increasing attention is the effect a proposed highway will have on aesthetics. These considerations are subjective as visual perceptions among people differ markedly. One person may aver that the construction of a new highway in a previously rural, hilly and natural area is an abomination. Another might say that the new highway makes it possible for more people to see natural areas that previously they could not conveniently

get to. Still others might think that a highway, designed to be compatible with natural terrain and properly landscaped, is in itself visually pleasing.

It is clear, however, that construction of a new highway in a previously rural or natural area, detracts from the "naturalness" of that area. It is also clear that much can be done, through highway design techniques and landscaping, to construct a new roadway in such a way as to maximize its compatibility with the natural surroundings. Also, carefully use of design techniques and landscaping can enhance the aesthetics of a developed area depending on what existed in the project area before construction of the highway.
Corridor Reanalysis, A.R. 17, pp. VI–23 to –24.

verse effects. However, consideration of the Fox Hollow alternative did include possible ways to minimize impact on the rural environment. It was not erroneous for the Secretary to decide, in determining whether the Fox Hollow alternative was prudent, that the effect on the rural quality of the land on which Fox Hollow would have been constructed was a detrimental factor despite the existence of ways to mitigate such an effect. Here the destruction of rural land combined with the minimal improvement of Route 7 led the Secretary to her finding that Fox Hollow was not a prudent alternative. There is no clear error of judgment by the Secretary evident to this court.

The Fox Hollow route was stated as requiring 239 acres of construct including 50 acres of active agricultural land and the partitioning of five farms. ROD, A.R. 20, p. 2. In addition, the ROD indicates that soil classification studies revealed that approximately 1½ acres of prime farmland and over 162 acres of "farmland of statewide importance" would be needed for the Fox Hollow route. Id. Plaintiff compares this to the 404 acres of agricultural land needed for the main segment of I-88 and to the amount of farmland which would remain in the County. Plaintiff also disputes the significance of the designation "farmland of statewide importance". The U.S. Department of Agriculture, Department of the Interior, and the EPA expressed their disapproval of the use of the agricultural land. FEIS, A.R. 12, pp. 7-6 to -7, 7-9 to -12, 7-18 to -19. The letters from these agencies make no reference to the disapproval being based on the designation of "farmland of statewide importance". The erroneous designation of the farms as commercial farms in the DEIS rather than hobby farms-rural residences as stated in the FEIS appears to be of no signifcance. The Secretary did not erroneously consider this as a negative factor in assessing whether the Fox Hollow alternative was prudent.

The Record of Decision indicates that damage to natural vegetation and wildlife habitat contributed to a rejection of the Fox Hollow alternative. However, these adverse effects were downplayed in the FEIS:

However, this vegetation is neither unique nor sensitive and there are no rare or endangered species in the study corridors.

Wildlife would be subject to a number of unavoidable impacts from any of the alignment alternatives. This is the result of the highway construction itself and the secondary effects of noise and other development resulting from the highway. In this project, these would be minimal, since induced land use changes are not significant.

\* \* \* \* \* \*

Generally, such impacts are the total amount of vegetation, wildlife habitat and agricultural land removed. However, the absolute amounts for any of the alignments are not significant and the quality of vegetation and wildlife habitat removed is not unique.

FEIS, A.R. 12, p. 5-46.

I. TERRESTRIAL ECOLOGY

I-1 Even a temporary loss of habitat may be fatal to wildlife in the area, suggesting irreversible displacement of individuals.

RESPONSE

In section 5.11, Terrestrial Ecology, the FEIS compares the alternative in detail, particularly in Table 5.11-1. In that section, the relative importance of the habitat in Fox Hollow is stressed. In an absolute sense (section 5.16.3), since there are no unique, unusually productive habitats, no threatened or endangered species, and since the habitats and species present are similar to those exsting in abundance in surrounding areas, loss of a very small percentage of habitat cannot be deemed significant.

Id. at 8-13. While the destruction is not deemed "unique", the quantity of undeveloped rural acres is recognized as great:

5.11.5 Fox Hollow A-B

This alternative calls for construction of a new highway through currently un-

developed, rural countryside which contains extensive areas of natural vegetation including large stands of mature secondary forest. The alignment would remove 141.2 acres of productive forest vegetation; an additional 77.9 acres of old fields and agricultural land would be taken. The productive value of these vegetation cover types is 1,098.5.

Removal of this vegetation also means removal of productive wildlife habitats. Such woodland creatures as white-tailed deer, raccoon, opossum and skunks could experience notable adverse impacts, and a wide range of bird species would also be affected. The edge forests abutting farms and abandoned fields are particularly productive wildlife habitats, as they provide a great diversity of niches within a small area. Many such edge zones would be eliminated by this alignment. The highway could present a significant new source of mortality for existing wildlife populations, and animal movements could be adversely affected if established travel routes are disrupted.

*Id.* at 5–31, –32. In addition this alternative was vehemently objected to by the U.S. Department of the Interior.

We recommend against implementation of the Fox Hollow A–B Alternative, as this alternative would proceed cross-country on entirely new alignment through relatively undeveloped land and would require the destruction of 218.9 acres of terrestrial habitat. The Fox Hollow A–B Alternative would have significant adverse impacts on wildlife resources, and would be unacceptable to us when other less environmentally destructive alternatives are available.

*Id.* at 7–19. The Secretary did not erroneously conclude that a disadvantage of Fox Hollow was its adverse effect on terrestrial ecology including vegetation and wildlife.

 Plaintiff asserts that the Secretary erroneously evaluated the cost of construction of the various alternatives. The total estimated cost of the Modified River Crossing is \$59,129,000; the cost of Fox Hollow alternative is \$49,396,000. The Record of Decision considers the Fox Hollow route to involve high costs of construction. Though on absolute terms construction of Fox Hollow requires less money, Gary Larsen of the FWHA stated that level of usage in relation to total money expended that led to the conclusion that construction of Fox Hollow was uneconomical.[8] Exh. 24, pp. 100–01. Although such a conclusion is not stated in the FEIS, the court will not assume that the Secretary was mistaken about the cost of the routes which was explicitly stated in the FEIS. Rather, as is obvious from the record, although the Fox Hollow route would divert some traffic away from Route 7, Route 7 would remain heavily used though unimproved, and the Fox Hollow route would be constructed along a completely new route. The Modified River Crossing, by contrast, would accomplish two stated goals of the connector project of (1) providing an interstate-quality connector between I–81 and the existing I–88 route and (2) improving traffic service in the area by upgrading Route 7. This combination of purposes of the Modified River Crossing route could reasonably lead to the Secretary's determination that the Modified River Crossing, on balance, was more economical than the Fox Hollow route.

 The Secretary found that the Fox Hollow alternative "would tend to increase the number of locations which would experience severe noise impact, compared to doing nothing or the preferred alternative." ROD, A.R. 20, p. 2. Again plaintiff disputes this finding. The FEIS states that Fox Hollow would increase by 30 the number of dwelling units affected by the route. Table 5.1–3, foll. p. 5–6, FEIS, A.R. 12. While this may not amount to a "disruption of extraordinary magnitude," *Stop H–3 Association v. Dole,* 740 F.2d 1442, 1452 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105

---

8. Testimony providing additional explanation to fill in the gaps of the administrative record is not inappropriate for court review. *Sierra Club v. United States Army Corps of Engineers,* 772 F.2d 1043, 1052 (2d Cir.1985).

S.Ct. 2344, 85 L.Ed.2d 859 (1985), which on its own would justify taking of parkland, it is properly a factor. The Secretary did not err in considering the noise increase from the Fox Hollow route a negative factor in this case, particularly in comparison to the Modified River Crossing alternative which would reduce the number of dwelling units affected by noise.

### C.

Plaintiff's argument as to the procedural requirements of § 138 is that the Secretary impermissibly delegated her statutory duty to NYSDOT by allowing NYSDOT to prepare the ROD in this case. The federal regulations require the Secretary to "complete and sign a ROD". 23 C.F.R. § 771.-127(a). The regulation further provides: "A preliminary ROD is to be prepared by the Administration in consultation with the applicant." *Id.* Through discovery in this action plaintiff obtained a handwritten memorandum from the files of NYSDOT which plaintiff argues indicates that NYSDOT rather than the FHWA prepared the preliminary draft of the ROD.[9] Also, plaintiff retrieved handwritten notes of a telephone conversation and a meeting which plaintiff argues indicates that NYSDOT was involved with revision of the ROD based upon comments from the FHWA. Exhs. 43 & 44. Plaintiff argues that these documents reveal that the FHWA seriously abrogated its responsibility to independently assess environmental factors to determine whether a feasible and prudent alternative exists to the use of parkland.

■ The only evidence proferred by plaintiff in support of its argument are the cryptic notes. Plaintiff neither deposed any of the persons whose names were linked to the notes nor did plaintiff call any of these persons as witnesses. Rather, plaintiff deposed Gary Larsen, the District Engineer for FHWA in charge of the project who, according to plaintiff, stated unequivocally that the ROD was prepared

initially by an employee of the FHWA and was internally revised by the FHWA based on comments received from persons in the FHWA. Plaintiff argues that the notes contradict Mr. Larsen's statements. Given that the notes do not unequivocally establish that NYSDOT rather than FHWA prepared the ROD, plaintiff has failed to carry its burden of proof on this issue and its argument is rejected.

### III.

■ The Federal-Aid Highway statutes require a public hearing as follows:

(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity of such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.

23 U.S.C. § 128. FHWA regulations require the holding of both "corridor" and "design" public hearings. 23 C.F.R. § 790.5(a). In this case a combined corridor and design hearing was held on December 15, 1982 as permitted by 23 C.F.R. § 790.5(b). The purpose of the public hearing is to insure public participation in the consideration of design proposals to assure that possible adverse effects of a proposed project are fully considered in its development. *Id.* § 790.1.

Plaintiff argues that the public hearing held failed to comply with § 128 because prior to the hearing NYSDOT was effectively committed to the Modified River Crossing alternative thereby precluding effective public participation in deciding which route would eventually be selected. Plaintiff does not dispute that the three

---

**9.** The handwritten note states: "McTiernan prepared this as a supplement to the 4f Statement...." Exh. 42. Attached thereto is what purports to be a preliminary Record of Decision.

alternatives were all presented for consideration and public debate at the hearing but rather that the hearing was a sham because of NYSDOT's prior commitment to the Modified River Crossing alternative. Plaintiff bases its argument on: (1) NYSDOT's close attention to BMTS' decision-making process, (2) NYSDOT's hiring a design consultant prior to a final decision on the preferred alternative, and (3) written documents evidencing NYSDOT's expectation of the eventual selection of the Modified River Crossing route prior to the public hearing.

The BMTS passed a resolution adopting the Modified River Crossing as its preferred alternative on July 1, 1982, prior to the hearing on December 15. The court accepts as true plaintiff's assertion that NYSDOT followed the proceedings of BMTS closely. However, there is nothing improper about this, as discussed earlier in this opinion; the views and objectives of a Metropolitan Planning Organization must be considered under 23 U.S.C. § 138. The memorandum and letters submitted by plaintiff, Exhibits 45–47, evidence the interest of NYSDOT in the decision-making process of the BMTS. However, there is no indication that NYSDOT would accept the final decision of the BMTS as binding on NYSDOT.

Plaintiff argues that NYSDOT's negotiation of a contract with a design contractor prior to the holding of the public hearing demonstrates an irrevocable commitment by NYSDOT to the Modified River Crossing. On September 29, 1982, the Regional Director of NYSDOT requested authorization to hire a consultant to design the route to be selected. Exh. 56. This request made explicit mention that design approval was still several months in the future. *Id.* The "consultant design process" was commenced in advance to assure that a design contractor would be "on board" at the time a final selection was made. Exh. 48. The FHWA issued the DEIS on November 8, 1982; on November 18 McFarland-Johnson Engineers, Inc. was designated as the consultant for NYSDOT. Exh. 64. The public hearing was held on December 15, 1982;

the FHWA approved the contract with McFarland-Johnson on June 6, 1983. Exh. 69. This authorization was described as "Preliminary Engineering for Contract Plan Preparation." *Id.* It provides: "This authorization is limited to detailed design to more clearly define environmental issues including work necessary to develop a right of way plan and property maps. The balance of detailed design resulting in PS & E may be undertaken once the Final Environmental Impact Statement is approved." *Id.* The contract with McFarland-Johnson for this work was executed on June 28, 1983. Exh. 70. However, the contract process was not completed until July 22, 1983, six months after the public hearing, when the Comptroller of the State of New York approved the executed contract: under the State Finance Law, a contract becomes binding on the state only upon approval and filing by the Comptroller. N.Y. State Fin. Law § 112 subd. 2 (McKinney Supp. 1986); *Blatt Bowling & Billiard Corp. v. New York*, 14 A.D.2d 144, 217 N.Y.S.2d 766 (3d Dept. 1961); *Becker v. New York*, 65 A.D.2d 65, 410 N.Y.S.2d 699, 700 (3d Dept. 1978), *aff'd* 48 N.Y.2d 867, 424 N.Y.S.2d 353, 400 N.E.2d 295 (1979).

The public hearing requirement is intended to provide a mechanism by which highway planners are "publicly confronted with opposing views, to ensure that they take account during the planning process of the desire and objections of citizens affected by proposed projects." *Coalition of Concerned Citizens v. Damian*, 608 F.Supp. 110, 124 (S.D. Ohio 1984) (citing *D.C. Federation of Civic Ass'ns, Inc. v. Volpe*, 434 F.2d 436, 441 (D.C.Cir.1970)). Public hearings must be conducted so as "to assure consideration of social, economic, and environmental impacts at a point that is meaningful." *Coalition*, 608 F.Supp. at 125. Plaintiff argues that NYSDOT's expressed preference for the Modified River Crossing alternative as evidenced by its written communications prior to the hearing and its contract with the design consultant McFarland-Johnson prior to the hearing, precluded the hearing from

serving its intended purpose. Plaintiff has the burden of proof to establish that the hearing did not comply with § 128. *Id.* These hearings must be more than mere informational meetings for the public. *Joseph v. Adams,* 467 F.Supp. 141 (E.D.Mich. 1978) (hearing held deficient because public meetings were held after final construction plans were formulated, and it was clear that public comments at the meeting were not considered).

 The hearing held in this case was just one month after the issuance of the DEIS by the FHWA. It is the DEIS to which the federal agencies and others addressed their criticisms of the proposed project as later printed in the FEIS. No binding contract had yet been entered into for the design of the project. The preference by NYSDOT for the Modified River Crossing alternative does not invalidate the public hearing; the governmental highway "planners are permitted to have a specific proposal and even to promot[e] it." *Coalition,* 608 F.Supp. at 125. Here, though NYSDOT was making preliminary preparations based on an assumption that the Modified River Crossing alternative would eventually be selected, plaintiff has failed to present evidence that the hearing was a sham. In addition, the record indicates that NYSDOT did not foreclose the feasibility of all but the Modified River Crossing alternative: The Colesville Road construction project which was in the planning and design stage at the time the FEIS was issued was undertaken in a manner which preserved the feasibility of constructing the Fox Hollow route. FEIS, A.R. 12, p. 3–11.

 Plaintiff points to testimony at the public hearing evidencing the frustration of some people that a consultant had been retained for the purpose of designing the project prior to the hearing. However, the statute does not mandate that the state DOT not proceed with its design planning until after the hearing is held. As previously discussed, the designation of McFarland-Johnson as the design consultant did not make the selection of the Modified River Crossing final. Plaintiff asserts that NYSDOT failed to consider the views of the persons who spoke at the hearing in opposition to the Modified River Crossing route. However, plaintiff presents no evidence in support of this assertion except for the FEIS in which the Modified River Crossing was presented as the preferred alternative. The criticism by TAMS of NYSDOT's difficulty, whether intentional or not, in soliciting public opinion early in the earlier planning stage is not relevant on this issue. It is the government planners rather than members of the community who are responsible under the Federal-Aid Highway statutes with developing feasible alternative routes. *Coalition,* 608 F.Supp. at 124. The statute dictates that the highway planners are to provide a forum for the public to air their views and that the planners take these views into account as part of the final selection process. Plaintiff has not demonstrated that NYSDOT failed to fulfill its duty in this regard. Perhaps, as recognized by TAMS, increased public participation earlier in the process would have been beneficial both to the planners and to the affected community but this court cannot conclude that the public hearing provided failed to meet the requirements of 23 U.S.C. § 128.

## IV.

NEPA requires the preparation of an EIS for projects which significantly affect "the quality of the human environment." 42 U.S.C. § 4332(2)(C). "[T]he EIS must set forth sufficient information for the general public to make an informed evaluation, and for the decision maker to fully consider the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action...." *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1029 (2d Cir.1983) (citations omitted).

 Plaintiff argues that the FEIS in this case did not meet the requirements of NEPA by NYSDOT's presentation of the

advantages of the Modified River Crossing route in an overly positive light while minimizing or omitting the advantages of the alternative routes. Plaintiff presents what it characterizes as omissions or misstatements of the facts relating to each route to argue that the FEIS was insufficient to make it possible for the Secretary, the federal agencies or the public to properly consider the alternatives and to make a fully-informed choice. The court's review is limited to determining whether the EIS appears to have been compiled in good faith and whether sufficient information is set out in order to allow for a competent decision. *See County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

Plaintiff argues that the FEIS mischaracterizes the Fox Hollow alternative as posing adverse consequences on agriculture. Specifically, the DEIS states that the Fox Hollow route would destroy commercial farms. The United States Department of Agriculture, Department of the Interior, and the EPA objected to the Fox Hollow route's use of agricultural land. FEIS, A.R. 12, pp. 7–6 to –7, 7–9 to –12, 7–18 to –19. This agricultural land was identified in the DEIS as including five commercial farms though the FEIS corrects this designation and states that the farms affected are actually "hobby farms, rural residences." Plaintiff argues that to the extent the FEIS presented the opposition to the federal and state agencies' objections to the Fox Hollow route, this was erroneous because the opposition was based on the agencies' belief that commercial farms were affected.

■ The information presented in the FEIS on the effect to agriculture from the Fox Hollow route was not misleading. First, the FEIS contains a supplemental letter by the New York Department of Agriculture and Markets which indicates that the farms designated commercial in the DEIS were "for the most part" "hobby farms, rural residences." *Id.* at 7–30. Based on this letter the FEIS responds that the Fox Hollow route would not cause a significant impact on agriculture. *Id.* at 7–31. The comments by the United States Department of Agriculture, the Department of the Interior, and the EPA were based on the detrimental effect on undeveloped or agricultural land generally rather than a designation as commercial or hobby farms. The FEIS is not misleading in including the comments of these agencies on the effects of the Fox Hollow route on agricultural land.

■ The Modified River Crossing route will traverse flood plains. The FEIS states that the proposed design of the bridge for the Modified River Crossing route will have a maximum effect on flood levels from ice jamming of 0.2 foot. *Id.* at 5–25, 7–59. This determination is not challenged by plaintiff. The FEIS concludes that the connector bridge for the Modified River Crossing will "not aggravate existing ice jamming problems because no new shallow areas would be created and the construction created by the new bridge would be minimal." *Id.* at 5–26. Ice jamming was spotlighted by TAMS as a potential problem. Exhs. 75 & 75. A FEIS does not satisfy the requirements of NEPA if it sweeps "stubborn problems or serious criticisms" "under the rug." *Silva v. Lynn,* 482 F.2d 1282, 1285 (1st Cir.1973); *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d at 1029. However, the FEIS contains the factual data from which the conclusion is drawn that the ice jamming problem is insubstantial. This suffices to demonstrate that the ice jamming has been considered and presented in good faith.

■ Plaintiff argues that the FEIS contains insufficient discussion of the effect of each alternative on streams. The Modified River Crossing route entails three stream crossings; Fox Hollow eight. Plaintiff argues that the FEIS should have contained a more detailed discussion of the streams affected. However, the particular streams and their characteristics are discussed in the FEIS. *See* FEIS, A.R. 12 Table 5.9–1 foll. p. 5–28; pp. 5–28, –30. In addition, the

FEIS specifically notes that all streams affected by Fox Hollow are small. *Id.* at 5–30. At a minimum the discussion in the FEIS of streams meets the "rule of reason" test under which an EIS need not be exhaustive to the point of discussing all possible details but is sufficient to enable a reasoned evaluation of each alternative's effect on streams. *See County of Suffolk,* 562 F.2d at 1375.

Plaintiff also argues that the FEIS fails to provide sufficient discussion of environmental problems discovered in the process of preparing the EIS evidencing defendants' failure to give sufficient consideration ot these problems. However, a thorough review of the FEIS convinces this court that the FEIS has not ignored pertinent data and contains sufficient information to enable full consideration of environmental factors involved allowing a reasoned decision. *See id.; Sierra Club,* 701 F.2d at 1029.

Plaintiff argues that the FEIS is deficient in failing to fully and accurately disclose effects on the alternative routes on other than environmental issues. Court review under NEPA is specifically directed toward insuring that the agency has taken a hard look at *environmental* consequences. *County of Suffolk,* 562 F.2d at 1375. The EIS is therefore examined to insure that the agency provides a basis for a reasoned decision after balancing the risks of harm against the benefits to be derived from the proposed route. *Id.* It does not appear that careful scrutiny by the court of non-environmental impacts is appropriate under NEPA. But, based on NEPA's requirement that an agency prepare an EIS in good faith, this court has reviewed the discussion in the EIS of the effect on traffic from each of the proposed routes. As concluded in the earlier discussion on § 4(f), this court concludes that traffic effects were properly presented in the EIS.

Plaintiff also argues the DEIS failed to note the opposition of the Town of Chenango to the Modified River Crossing.

Defendants argue in their brief that though the Supervisor of the Town of Chenango initially opposed the Modified River Crossing, the Town of Chenango actively participated in the Ad Hoc Committee process and did not oppose the recommendation of the Ad Hoc Committee or the BMTS. The Supervisor's letter, though inadvertantly omitted from the draft EISs, was included in the FEIS. A.R. 12, pp. 7–57 to –59. There is no bad faith evident to the court that NYSDOT concealed opposition to the Modified River Crossing by the Town of Chenango.

V.

For all of the foregoing reasons plaintiff's motion for a preliminary injunction is denied. The decision of the Secretary granting approval for the construction of the Modified River Crossing route for the I–81/I–88 Connector is hereby upheld; judgment is hereby granted to defendants.

IT IS SO ORDERED.